401 So.2d 1033 (1981)
Linda Gail BURNS, w/o and David Burns
v.
Edward FERNANDEZ, Toledo National Insurance Co. and Hartford Insurance Company and
New Orleans Easter Seal Society, Inc. and Northwest Insurance Co.
Nos. 11481, 11482.
Court of Appeal of Louisiana, Fourth Circuit.
June 10, 1981.
Rehearing Denied August 17, 1981.
*1035 Stephen C. Kogos, New Orleans, for Linda Gail Burns, plaintiff, appellee and appellant.
Roger J. Larue, Jr., Metairie, for New Orleans Easter Seal Society, Northwest Insurance Co., defendants.
Nelson, Nelson & Lombard, Ltd., Irving H. Koch, New Orleans, for Edward Fernandez, defendant.
Paul P. Rutledge and David G. Fassnacht, Metairie, for Hartford Insurance Co., defendant-appellant.
Before SAMUEL, REDMANN and BOUTALL, JJ.
BOUTALL, Judge.
This appeal arises from a judgment of the trial court awarding damages to the plaintiffs for personal injuries sustained in an automobile accident.
On October 26, 1976, at about 7:30 in the morning, one of the plaintiffs, Linda Burns, was operating a motor vehicle on behalf of her employer the New Orleans Easter Seal Society (hereinafter referred to as NOESS) when her vehicle was struck from the rear by an automobile being driven by the defendant Edward Fernandez. Mrs. Burns sustained injuries to her neck and back. Shortly thereafter, Mrs. Burns and her husband David Burns filed suit to recover damages for the personal injuries sustained by the former against Fernandez for his alleged negligence in causing the accident and injuries, Toledo National Insurance Co. and All-Star Ins. Corp. (hereinafter referred to as Toledo and All-Star respectively) as insurers of Fernandez, and Hartford Insurance Co. (hereinafter referred to as Hartford) as uninsured motorist insurer of NOESS. Fernandez answered and filed a third party demand against Toledo and All-Star as his insurers requesting that they indemnify him for any sums for which he may be liable unto plaintiff. Toledo, by a petition of concursus, deposited $5,000 into the registry of the trial court which figure represented the maximum limits of its coverage. Hartford filed a third party demand against Fernandez, Toledo and All-Star for indemnification in the event Hartford was held liable unto the plaintiffs.
A second suit was filed by Mrs. Burns individually and against NOESS, as her employer, and its insurer Northwest Insurance Co. (hereinafter referred to as Northwest) for the recovery of workman's compensation benefits. NOESS and Northwest filed a third party demand against Fernandez, Toledo, and Hartford to recover any sums which they may be liable for unto the plaintiffs. These two suits were consolidated for trial.
Upon trial on the merits of this matter, the lower court entered judgment as follows: 1) in favor of the plaintiffs and against Fernandez and Toledo in the amount of $5,000, which figure represents the maximum amount of coverage under the insurance policy; 2) in favor of the plaintiffs and against Hartford in the amount of $31,960.35, which figure represents recovery under the uninsured motorist provision in the policy of NOESS; 3) in favor of the plaintiffs and against Edward Fernandez and Hartford in solido, in the amount of $10,000; 4) in favor of Northwest and against the plaintiffs and Hartford in the amount of $10,270.52; and 5) dismissal of the workman's compensation demands made by Mrs. Burns.
*1036 On appeal, a multitude of issues have been raised for our consideration. For the sake of clarity and understanding, each issue will be set apart and considered individually.

UNINSURED MOTORIST COVERAGE
At the time of the accident on October 26, 1976 Fernandez was covered under two different policies of insurance; one with Toledo wherein coverage was provided in the amount of $5,000 per person and the other with All-Star wherein coverage amounted to $95,000 per person. Also, at this time, NOESS was insured by Hartford under a comprehensive liability policy which provided coverage for its fleet of vans as well as an uninsured motorist provision. All three of these insurers were named as defendants in this matter as per their respective policies of insurance. Subsequently, on March 1, 1977, by order of the Circuit Court of Milwaukee County, Wisconsin, All-Star was ordered liquidated because of its condition of insolvency. This court further ordered that all pending actions and proceedings against All-Star were thereby abated. A similar ruling was entered on April 22, 1977 by the District Court for the Parish of East Baton Rouge. Shortly before trial, Toledo filed a petition for concursus and deposited $5,000 into the registry of the court, which figure represented the maximum limits of its coverage.
The uninsured motorist provision of the Hartford policy with NOESS provided coverage in the amount of $5,000 per person per vehicle or $10,000 per accident. This provision listed NOESS as the named insured and described those individuals who would be regarded as "persons insured" as follows:
"II. PERSONS INSURED
"Each of the following is an insured under this insurance to the extent set forth below:
"(a) The named insured and any designated insured and, while residents of the same household, the spouse and relatives of either;
"(b) any other person while occupying an insured highway vehicle; and
"(c) any person, with respect to damages he is entitled to recover because of bodily injury to which this insurance applies sustained by an insured under (a) or (b)."
The basic issue here is whether the plaintiffs will be permitted to "stack" the coverage for all 26 vans insured under the uninsured motorist provision or will their recovery be limited to the uninsured motorist benefits for the particular vehicle which Mrs. Burns occupied at the time of the accident.[1]
Mrs. Burns contends that she is a named insured under the uninsured motorist provision and she should be permitted to stack the coverage of all 26 vehicles covered under the policy, thereby exposing Hartford to a possible liability of $260,000. The trial court adopted this contention reasoning that since separate premiums were paid for the benefit of the employees of NOESS, Mrs. Burns would be permitted to stack the uninsured motorist coverage.
In Briley v. Falati, 367 So.2d 1227 (4th Cir. 1979) Writ denied, 369 So.2d 1379 (La. 1979) we were faced with a similar issue of whether to permit stacking under an uninsured motorist provision of an insurance policy. In that case we distinguish between the named insured and the permissive user in determining whether stacking would be allowed. The named insured was regarded as the party so named in the policy of insurance and the permissive user being the party insured merely by virtue of his presence in an insured vehicle. Stacking was permitted for the named insured based on the theory that premiums were paid for this particular type of coverage; it was not allowed for the permissive user as no additional *1037 premiums were paid for by him or on his behalf. Nevertheless, the permissive user would be allowed uninsured motorist benefits but only insofar as the vehicle in which he was present at the time of the accident. Furthermore, we noted that the permissive user would not be precluded from such coverage as R.S. 22:1406D(1)(b) permits such additional coverage for the permissive user provided he contracted for and paid for additional coverage. We stated therein:
".... Though a permissive user is clearly entitled to be considered an omnibus insured as to the uninsured motorist coverage provided that vehicle, he has no other implicit or actual right. Louisiana drivers who, perceiving the need for uninsured motorist coverage in greater than the basic amounts, have the opportunity to purchase same and, in so doing, are entitled, under certain circumstances, to `stack' that coverage with the uninsured motorist coverage existent on an individually borrowed or leased vehicle, but that is only because the concerned individual anticipated his needs and, thereupon, contracted for and paid for additional coverage.
The so-called "premium payment" rationale adopted by this court is not an original one. It has been adopted in several jurisdictions. See Lambert v. Liberty Mutual Insurance Co., 295 Ala. 414, 331 So.2d 260 (1976); Cunningham v. Ins. Co. of North America, 213 Va. 72, 189 S.E.2d 832 (1972); Sturdy v. Allied Mutual Ins. Co., 203 Kan. 783, 790, 457 P.2d 34, 40 (1969).
In applying the above rationale to the case before us we find that the terms of the policy list NOESS as the named insured. The policy further indicates that Mrs. Burns in her capacity as an employee of NOESS is a permissive user insofar as the uninsured motorist provision is concerned as she was insured merely by virtue of her presence in the insured motor van owned by NOESS. These findings are consistent with the premiums paid by NOESS for uninsured motorist coverage. The policy indicates that NOESS paid a separate $9.00 premium for each of their 26 vehicles for uninsured motorist coverage in the amount of $5,000 per person per vehicle or $10,000 per accident per vehicle. The total premium that was paid was $234. It can't be seriously contended that the $234 premium paid by NOESS would permit stacking by both the named insured NOESS and the permissive user Mrs. Burns. The premium payment rationale supports a finding that the premium paid was only sufficient to permit stacking by NOESS and certainly not by Mrs. Burns. Stacking by the permissive user would be permitted had the appropriate premium been paid, but there is no record of any such payment by Mrs. Burns or on her behalf by NOESS. Therefore, we reverse the finding of the trial court permitting stacking by Mrs. Burns and hold that her recovery under the uninsured motorist provision of the Hartford policy is limited to the benefits as per the particular vehicle occupied by her at the time of the accident.
The trial court as well as the plaintiffs cite Seaton v. Kelly, 339 So.2d 731 (La.1976) in support of the view that stacking should be permitted in the case before us. However, we feel that a close reading of the rule of law used by the Supreme Court in that case in effect applies the premium payment rationale adopted by our court in Briley v. Falati, supra, and applied above.[2] In Seaton v. Kelly, supra, stacking was permitted as follows:
"..... if a plaintiff is an insured under two or more policies or one policy covering two or more automobiles, pays premiums or has premiums paid for his benefit for two or more different uninsured motorist coverages, he can cumulate the coverages."
As indicated previously, the total premium of $234 was based on a premium of $9.00 per vehicle for uninsured motorist coverage. The employee is covered only *1038 while occupying a vehicle. Thus, Mrs. Burns is only insured under the policy language "to the extent" that she "occupied an insured highway vehicle". She only occupied one van and not 26 vans. As to the other 25 vans she is not an insured. Premiums were not paid by NOESS for her benefit for two or more different uninsured motorist coverages, and Mrs. Burns could not be permitted to cumulate coverages.

AWARD OF DAMAGES: COMMUNITY OR SEPARATE PROPERTY?
The trial court in its judgment awarded unto Mr. and Mrs. Burns as plaintiffs the sum of $46,960.41. This award of damages was broken down into general and special damages as follows: $7,815.85 for medical expenses, $4,144.56 for loss of wages, and $35,000 for pain and suffering. The plaintiffs contend that the two items of special damages, namely the medical expenses and loss of wages, belong to their community property but that the award for general damages of pain and suffering is the separate property of Mrs. Burns. This contention is supported by Flowers v. U. S. Fidelity & Guaranty Co., 381 So.2d 378 (La. 1980) wherein the court stated:
"A wife's action for damages resulting from offenses and quasi-offenses are her separate property and are recoverable by her alone. La.C.C. arts. 2334, 2402. On the other hand, claims for medical expenses for either spouse belong to the community and are recoverable by the husband as its head."
This case does not address the damage award for loss of wages, however, it is well settled that this form of damages falls into the community. Polman v. Mohasco Corp., 371 So.2d 838 (4th Cir. 1979).
Based on the foregoing we find that the trial court was in error in awarding the total amount of damages to both Mr. and Mrs. Burns. Accordingly, the judgment should be amended so as to award the general damages of $35,000 to Mrs. Burns individually and the special damages amounting to $11,960.41 be awarded to Mr. Burns as head of the community property regime.

THE RELEASE EXECUTED BY MRS. BURNS
As previously indicated, All-Star Insurance Corp., who was the secondary liability carrier for Fernandez, was ordered liquidated because of its condition of insolvency on March 1, 1977 by order of the circuit court of Milwaukee, Wisconsin. Notice of liquidation was made to all claimants and potential claimants who wished to share in the distribution of All-Star's assets. Apparently, Mrs. Burns filed a proof of claim against All-Star based on the alleged negligence of its insured Fernandez in causing the accident and her resulting injuries. This proof of claim contained a release provision which states:
"RELEASE PROVISION. The undersigned hereby releases Edward Fernandez, an insured of All-Star Insurance Corporation, to the extent of the insured's applicable policy limit, of and from liability to the undersigned on the cause of action or causes of action which the undersigned has asserted against the insured. It is understood that this Release shall be void if the insurance coverage of the insured is avoided by the Liquidator."
At the trial on the merits, Fernandez pleaded an exception of Res Judicata based on the contention that the release provision in the proof of claim filed by Mrs. Burns operated as a bar to recovery against Fernandez. This exception was denied by the trial court. In its reasons for judgment, the trial court found as a fact that All-Star was insolvent.
It is well settled in Louisiana jurisprudence that a valid compromise or release between parties to a legal proceeding requires some sort of cause of consideration. La.C.C. Art. 3071, Louette v. Security Industrial Insurance Co., 361 So.2d 1348 (3rd Cir. 1978); Hyatt v. Hartford Accident and Indemnity Co., 225 So.2d 102 (3rd Cir. 1969). This consideration need only be an adjustment of differences and a desire to set at rest all possibility of litigation. Collier v. Administrator, Succession of Blevens, 136 So.2d 774 (4th Cir. 1962).
*1039 We conclude that the trial court acted properly in denying the exception of Res Judicata thereby nullifying the effect of the release. Our conclusion is based on the fact that Mrs. Burns received no cause or consideration in executing the release provision. All-Star already owed Mrs. Burns the full amount (within its limits) of her damages, and therefore the promise on All-Star's behalf to pay part of the already-existing debt gave Mrs. Burns nothing and could not have been a true cause or consideration for her promise of release. Additionally, from a somewhat different standpoint, one could conclude that the release provision was predicated on the proposition that All-Star would assume the liability of its insured, Fernandez, to the extent of the policy limits. When All-Star was liquidated and unable to assume this liability, there was no longer any consideration for the release of Fernandez. The other basis used in reaching our conclusion is the last clause contained in the release provision itself. It indicates that the release shall be voided if the insurance coverage of the insured is avoided. This clause is directly applicable to the matter before us as the claim by Mrs. Burns was apparently avoided by the liquidator.

AWARD OF DAMAGES
To facilitate our discussion of the award of damages we will consider the trial court's award of damages. We will consider initially the trial court's award for medical expenses, loss of wages and pain and suffering, followed by a review of its judgment denying the claim of Mrs. Burns for damages for her alleged mental condition.

I
The evidence reveals that after the auto accident, on the morning of October 26, 1976, Mrs. Burns returned to work that same day. She went to work the next day but left early because of the pain she was experiencing in her neck and shoulder. The next morning, or two days after the accident, Mrs. Burns was unable to get out of bed due to the pain in her neck and arm. Consequently, she was taken to the emergency room at East Jefferson Hospital for examination and treatment. Later that same day, Mrs. Burns was transferred to Metairie Hospital where she remained for four to five days. During this period of hospitalization X-rays were performed by Dr. Daniel O'Quinn which apparently proved negative. An examination by Dr. O'Quinn revealed that Mrs. Burns had soft tissue damage in the area of her neck. The plaintiff received injections of xylocaine and cortisone, as well as medication to relieve the pain associated with this soft tissue injury. She was discharged on November 1, 1976.
Following her discharge, Mrs. Burns continued to experience pain in the neck area. On November 11, 1976, the plaintiff went to see Dr. Vernon Kroll, a general surgeon. At that time his examination revealed that Mrs. Burns had no localizing neurological defects, but she did have a limitation of motion of the head upon the neck and spasticity of the neck muscles, particularly the trapezius. The plaintiff's condition did not improve over the course of the next few weeks and she was re-hospitalized on December 17, 1976 at Southern Baptist Hospital for treatment and tests. Upon her admittance to the hospital, Mrs. Burns was placed in traction at the recommendation of Dr. Kroll. At the conclusion of the traction period she continued to experience pain in the area of her neck whereupon Dr. Donald Richardson, a neurological surgeon, was called in to review her case. Dr. Richardson's examination revealed findings similar to those made by Dr. Kroll. A myelogram was performed on the plaintiff which revealed a large cervical disc puncture at the C-4 disc level which could not be successfully treated by conservative therapy. Consequently, surgery was performed on January 12, 1977 resulting in the removal of her disc at the C-4 level. Following the surgery, Mrs. Burns remained in the hospital for an additional 7 days after which she was discharged and told by Dr. Richardson to remain in bed for 3 weeks. Dr. Richardson prescribed a cervical collar for the plaintiff as well as medication to relieve the pain *1040 associated with the surgery. Examination by him one month after the surgery revealed that Mrs. Burns was recovering according to schedule. At that time, she complained of mild neck and shoulder discomfort. Dr. Richardson permitted the plaintiff to increase her activities including driving an automobile. Over the course of the next 6 months, the plaintiff continued to visit Dr. Richardson for examination and treatment of the pain in her neck area. X-rays performed in August of 1977 revealed that the fusion was fusing properly. Mrs. Burns was discharged at that time whereupon Dr. Richardson gave the following prognosis: the plaintiff has a permanent disability in the cervical spine area of 10 to 20%; the plaintiff would be able to return to work including the same activities that she performed prior to the surgery; and she had no limitation in the use of her upper extremities.
At the time of her discharge in August of 1977 Dr. Richardson suggested that Mrs. Burns visit Dr. Kroll for further medical care. Dr. Kroll examined and treated the plaintiff on a monthly basis through April of 1978, after which she was apparently discharged. Mrs. Burns continued to complain of pain in the neck area during the course of these visits. After this series of examinations, Dr. Kroll came to the conclusion that as of April, 1978 Mrs. Burns would be unable to return to any occupation which would require persistent use of her extremities, such as driving or picking up weights. This conclusion was not permanent as it was possible that the plaintiff could be rehabilitated at some point in time in the future.
Finally, the testimony of both Drs. Richardson and Kroll reflect the view that the injuries and subsequent surgery were caused by the accident.
Based on this evidence the trial court entered judgment awarding to the plaintiffs $7,815.85 in medical expenses, $4,144.56 in lost wages and $35,000 for pain and suffering for a total figure of $46,960.41. The plaintiffs contend that the evidence presented warrants an increase in the award. However, upon a review of the evidence presented we conclude that the award by the trial court was not manifestly erroneous and did not constitute an abuse of discretion. Reck v. Stevens, 373 So.2d 498 (La.1979).
We recognize the conflict in the prognoses given by Drs. Richardson and Kroll. Apparently, the trial court adopted the view of Dr. Richardson in reaching its decision as to the award of damages. It is well settled that the trial court as the trier of fact is in the best position to view the testimony of the various witnesses, and its findings cannot be disturbed in the absence of an abuse of discretion. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). Accordingly, we find that the trial court has not committed an abuse of discretion.

II
As indicated previously, we are now faced with a review of the trial court denial of the claim raised by Mrs. Burns for damages for her alleged mental condition.
A review of the record before us indicates that Mrs. Burns has had a history of emotional disturbances and periods of depression and anxiety dating back to the time when she was six years old, when nerve medication was prescribed for her. A review of this history can be described best by considering the events in her life prior to the accident and those occurring after the accident. During the pre-accident period of her life, Mrs. Burns had encountered numerous surgeries including: 15 dilation and curettages, a hysterectomy, a hemorrhoidectomy, a tonsilectomy, an appendix removal and a skin removal. Other medical difficulties experienced by the plaintiff included 6 miscarriages, periods of blood vomiting, a heart murmur, and a gastric ulcer. Besides these numerous problems and the trauma and anxiety associated with them, Mrs. Burns has experienced other pre-accident difficulties which have affected her mental condition. They include: several periods of separation from her husband, one for a period of nine months, a period of time in which her mentally disturbed brother-in-law *1041 lived with her, and a weight condition. These numerous mental and physical problems caused her to miss work at NOESS on numerous occasions. These absences became so numerous that NOESS asked her to resign her position of employment, but no such resignation was made. Mrs. Burns attributed these absences in large part to the marital difficulties she was experiencing.
Following the accident and the subsequent surgery the plaintiff fell into a state of depression and high anxiety. Apparently this condition existed up until October of 1977 or 1 year after the accident. On October 28, 1977 Mrs. Burns was examined by Dr. Kroll who testified that her mental condition had improved. Upon subsequent visits in November and December of 1977, and January of 1978, the plaintiff's emotional condition improved substantially. Her next and last visit with Dr. Kroll was in April of 1978 when Mrs. Burns had returned to a depressed state, which Dr. Kroll, attributed to the death of her father in March of 1978.
Some four months later on August 15, 1978, or approximately 1 year and 10 months after the accident, Mrs. Burns visited Dr. Albert Cohen, a psychiatrist. Dr. Cohen conducted a 45 minute interview with the plaintiff, most of which centered around a review of her history. Based on this 45 minute interview and a brief review of some of the medical reports of Drs. Kroll and Richardson, Dr. Cohen concluded that the plaintiff's condition of depression and anxiety was caused by the accident occurring in October of 1976. Dr. Cohen next saw Mrs. Burns approximately one year later in July of 1979. After this brief interview he reached the same conclusion that her mental condition was caused by the accident. He further indicated that Mrs. Burns was in need of psychiatric treatment for a period of 6 months to 2 years.
In denying Mrs. Burns claim of damages for her alleged mental condition, the trial court gave the following reasons: 1.) The accident experienced by the plaintiff was another in a series of traumatic events in her life; 2.) the plaintiff would be in her present mental condition whether this accident did or did not occur; 3.) because of her past problems Mrs. Burns was very vulnerable; and 4.) the loss of her father had a substantial impact upon her emotional condition.
After considering both the evidence and the judgment of the trial court, we cannot say that its decision to deny damages for Mrs. Burns' mental condition was manifestly erroneous. The trial court's reasons for judgment are accurate and indicative of the careful consideration given by that court to this particular matter. In further consideration of this issue we note that the trial court considered the depression and anxiety experienced by the plaintiff in connection with the accident in reaching its award of $35,000 for pain and suffering.
Although Dr. Cohen testified that the plaintiff had a mental condition and further that this condition was caused by the accident, there is ample basis to support the trial judge's discounting of this testimony. The interview conducted with Mrs. Burns was very brief, only 45 minutes, and occurred almost two years after the accident, making it difficult to believe that such an interview could yield an accurate conclusion; Mrs. Burns had experienced numerous other emotional difficulties since the accident including the breakup of her marriage, the death of her father and gall bladder surgery, making it more probable than not that her condition some two years after the accident was attributable to these events as opposed to the accident itself; and the testimony of Dr. Kroll that Mrs. Burns' mental condition had improved substantially as of January 1978, after which her condition regressed dramatically due to the death of her father.

THE INABILITY TO PAY DOCTRINE
In the judgment entered by the trial court the liability of Fernandez was limited to $10,000. In reaching this decision the court relied on the inability to pay doctrine as applied in Barnett v. Vanney, 360 So.2d 617 (4th Cir. 1978). Under this *1042 doctrine the inability of a defendant to pay a judgment is a proper consideration in assessing the amount of damages for which a defendant will be held liable for his tortious acts.
In reviewing our previous findings regarding the award of damages we indicated that a total award of $46,960.41 was not an abuse of discretion. Recall that this damage award consists of $7,815.85 in medical expenses, $4,144.56 in lost wages, and $35,000 for pain and suffering. Thus almost $12,000 (plus interest for about 3 years) are special damages, and that amount, even after deduction of Fernandez's $5,000 insurance, will almost consume Fernandez's alleged entire net worth of $10,000. Under those circumstances, as in Becnel v. Ward, 286 So.2d 731 (La.App. 4th Cir. 1973) writ refused 290 So.2d 900, the quantum set by the trial judge must remain beyond defendant's ability to pay and he may face bankruptcy in any event. Accordingly, there appears no reason to apply the inability to pay doctrine (which in effect was not truly applied against plaintiffs but rather against Hartford in the judgment) against the plaintiffs.
We point out that the trial judge fixed the total damages at $46,960.41, which we consider to be a fair award. Liability for this sum is only $5,000 from the Toledo policy and $5,000 from the Hartford policy. If we apply the inability to pay doctrine and limit Fernandez's liability to $10,000 the plaintiffs are limited in recovery to $20,000. Deducting the special damages of $11,960.41 leaves plaintiffs with a recovery of only $8,039.59 for general damages as opposed to the $35,000 set by the court. (The recovery of $10,275.52 of this amount by Northwest as workman's compensation carrier under R.S. 23:1101 and 1103 is presumably offset by plaintiffs' previous receipt of that amount from Northwest).[3] Thus the effect of limiting the liability of Fernandez is to deny the recovery for the damages they have suffered.
The inability to pay doctrine has a long history dating back to 1898 when it was first applied in Loyacano v. Jurgens, 50 La.Ann. 441, 23 So. 717 (1898). Since that time it has been applied on numerous occasions by the various courts of our state. As indicated previously, the rule permits the admittance of evidence concerning the ability of the defendant to respond in damages to be considered in determining the amount of the judgment to be awarded. The theory behind this doctrine was espoused by our learned brothers of the 2d Circuit in Cole v. Sherrill, 7 So.2d 205 (2d Cir. 1942), wherein it was stated:
"It has never been considered good policy to bankrupt one to pay another even though the award granted is not in line with other cases involving the same injuries and might not fully compensate the plaintiff for the injuries he received. Fair justice between both parties must be arrived at."
We are hard pressed to understand how such a doctrine could remain in our jurisprudence in light of the equally well known policy of Louisiana law that damages awarded in tort cases are compensatory in nature and not punitive. If damages are to be compensatory they should be assessed according to the plaintiff's injuries as a result of the defendant's fault and not according to the defendant's economic position in life. Moreover, it appears to us that there may be merit to the argument that the application of the inability to pay doctrine *1043 is violative of the Equal Protection Clause of Art. 1 § 3 of the Louisiana Constitution in that a defendant in a tort suit is classified according to his degree of wealth. For the defendant who is in impecunious circumstances his liability for his tortious acts is limited according to these circumstances whereas for the defendant whose financial disposition is not restricted, his liability for his delicts is limitless. We do not suggest that such a classification is a suspect one or that there is a violation of a fundamental constitutional right. Chabert v. La. High School Athletic Association, 323 So.2d 774 (La.1975). However, we submit that this classification appears to be arbitrary. Furthermore, perhaps the theory behind the doctrine is not a rational one in light of the prevailing rule of law that, "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La.C.C. Art. 2315. Equally troublesome to us is the paradox in the law which permits the admittance of evidence on a defendant's inability to pay for his tortious acts but does not permit evidence on the defendant's ability to pay. Ashley v. Nissan Motor Corp. in USA, 321 So.2d 868, 874 (1st Cir. 1975).
In recent years the equity and usefulness of this doctrine has been challenged. Most notably in Davis v. Moore 354 So.2d 1379 (La.1978), where a justice of the Supreme Court, concurring in the court's decision to deny a writ of certiorari or review, indicated that the court should, ".... overrule the doctrine that the poverty of the defendant should reduce damages for which a tortfeasor is held liable..." Also see: Davis v. Moore, 353 So.2d 740, 743 (4th Cir. 1977). Furthermore, we note that because of the harsh consequences which this doctrine can create in its application certain limitations have been placed upon its application. In Lacaze v. Horton, 100 So.2d 252 (2d Cir. 1958) the court indicated that this doctrine should not be applied to the extreme. The court stated:
"It must be borne in mind that this principle is not intended to completely relieve a defendant of liability for reparation of damages inflicted by his own negligence, nor should it be considered as justifying the reduction of the allowance of damages to a bare minimum. Either of these alternatives, in our opinion, would be an extreme application of the principle and would result in effecting a gross injustice toward a plaintiff, under the guise of the application of a humane consideration for the plight of an impecunious defendant."
A second limitation was adopted in Daniels v. Conn, 382 So.2d 945, 953 (La.1980) wherein the court indicated that:
".... where there are solvent and insolvent tortfeasors liable in solido, evidence of the insolvent defendant's inability to pay may not be considered by the trial judge (trier of fact) in determining damages to be awarded to the plaintiff, or in apportioning damages as between those joint tortfeasor defendants at the trial on the merits of plaintiff's claim."
In considering the foregoing, an application of the inability to pay doctrine to the facts before us represents an application to the extremes. By limiting the liability of Fernandez to $10,000, coupled with the liability of Hartford and Toledo and the claim of Northwest as the workman's compensation insurer, the recovery by plaintiffs is inadequate and unreasonable. As indicated in the jurisprudence above, this doctrine should not be used to reduce the allowance of damages to the plaintiffs to a bare minimum. Therefore, we find that the trial court was in error in limiting the liability of Fernandez to the sum of $10,000.
For the reasons expressed, the judgment of the trial court is reversed in part, amended in part and affirmed in part, and recast as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there is judgment in favor of plaintiffs in the sum of $46,960.41, apportioned $35,000 to Linda Gail Burns and $11,960.41 to David Burns on behalf of the community between them, and against the defendants as follows:
1) against Edward Fernandez and Toledo National Insurance Company in solido for *1044 $5,000 with legal interest from judicial demand until filed in registry of court;
2) against Edward Fernandez and Hartford Insurance Company in solido for $5,000, with legal interest from date of judicial demand until paid;
3) against Edward Fernandez for $36,960.41, with legal interest from date of judicial demand until paid.
IT IS FURTHER ORDERED there be judgment in favor of Northwest Insurance Company and against plaintiffs, Linda Gail Burns and David Burns, and the defendants Edward Fernandez and Toledo National Insurance Company recognizing its claim in the amount of $10,270.52 and granting apportionment of the above judgment in accordance with R.S. 23:1103 and with Fontenot v. Hanover Insurance Company, 385 So.2d 238 (La.1980).
Those portions of the judgment appealed dismissing the workman's compensation demands of Linda Gail Burns against Northwest Insurance Company and the Easter Seal Society and setting expert witness fees are affirmed.
Trial court costs are assessed against defendants Edward Fernandez, Toledo National Insurance Company and Hartford Insurance Company in solido. Appellate court costs are assessed against defendants Edward Fernandez and Toledo National Insurance Company in solido.
REVERSED IN PART, AMENDED IN PART, AND AFFIRMED IN PART AND RECAST.
NOTES
[1] At the time of this accident in October of 1976 R.S. 22:1406 had not as yet been amended so as to prohibit "stacking" under uninsured motorist provisions of insurance policies. The amendment prohibiting "stacking" was adopted by the legislature the following year in 1977 by Act No. 623 § (1).
[2] We note that the rule of law enunciated in Seaton v. Kelly, supra, was adopted from numerous other cases from the Supreme Court. See Graham v. American Casualty Co. of Reading, Pa., 261 La. 85, 259 So.2d 22 (1972); Deane v. McGee, 261 La. 686, 260 So.2d 669 (1972).
[3] The recovery of the workman's compensation carrier payments is not governed by the same rules applicable to recovery by plaintiffs. We call attention to the case of Fontenot v. Hanover Insurance Company, 385 So.2d 238 (La. 1980) which differentiates between the recovery of the carrier from the tort-feasor and the right of preferential payment under the statute against the employee. The court noted, 385 So.2d 240: "It does not appear that the legislature intended for the employer to be reimbursed from the employee's award for items which the employee has not recovered from the third person."

Along this same line of reasoning, we also note the case of Bannon v. Edrington, 392 So.2d 186 (La.App. 4th Cir. 1980) writs granted, in which we held that a workman's compensation payer does not have a claim against proceeds from an action against an uninsured motorist insurer.