505 A.2d 109

**John W. HOWELL et al.**

v.

**HARLEYSVILLE MUTUAL INSURANCE CO.**

**Misc. No. 25, Sept. Term, 1985.**

Court of Appeals of Maryland.

Feb. 28, 1986.

Ronald H. Jarashow (Franch, Earnest & Cowdrey, P.A., on brief), Annapolis, for appellants.

Stephen P. Kleeman (David D. Patton, on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., SMITH, COLE, RODOWSKY, COUCH and McAULIFFE, JJ., and CHARLES E. ORTH, JR., Associate Judge of the Court of Appeals (retired), specially assigned.

SMITH, Judge.

We shall hold in this case that there cannot be intra-policy "stacking" or pyramiding of uninsured motorists benefits. The case arises on certification of a question of law from the United States District Court for the District of Maryland pursuant to Maryland Code (1974) § 12–601, Courts and Judicial Proceedings Article. The question certified is:

"Whether the Harleysville insurance policy issued to Pritchett and Maryland law permit the stacking or aggre-

gating of uninsured motorists coverage under the facts of this case?"

The facts are gleaned from the stipulation entered into by the parties in the United States District Court.

On November 13, 1982, John W. Howell was an employee of Pritchett Transportation Company, Inc., and was driving a van owned by Pritchett. Harleysville Mutual Insurance Company insured the van. Howell was injured in a collision with an uninsured motor vehicle. His injuries were severe and as of the time of the stipulation his medical bills exceeded $55,000. The Harleysville policy had an uninsured motorists endorsement, one required by Code (1957, 1979 Repl. Vol., 1985 Cum.Supp.) Art. 48A, § 541(c)(2).[1] Howell presented an uninsured motorists claim to Harleysville under its policy. The claim was denied because Harleysville had paid Howell in excess of $50,000 pursuant to Pritchett's workmen's compensation insurance policy, also carried with Harleysville in a separate policy. Code (1957, 1979 Repl. Vol.) Art. 48A, § 543(d) provides, "Benefits payable under the coverages required in §§ 539 and 541 of this article shall be reduced to the extent that the recipient has recovered benefits under workmen's compensation laws of any state or the federal government." As we shall see, a similar provision is in subject policy.

Pritchett is a U.S. mail carrier with its principal place of business at Cambridge, Maryland. The policy in question carried uninsured motorists endorsements for nineteen vehicles.

Item Two on the declaration page of the policy, entitled schedule of coverages and covered autos, shows under uninsured motorists coverage that the most that will be paid for any one accident or loss is $50,000. A premium of $76 was charged for that coverage.

---

1. Coverage required under such an endorsement must be no "less than the coverage afforded a qualified person under Article 48A, §§ 243H and 243–I," that is $20,000 per person and $40,000 per accident.

The uninsured motorists endorsement states in relevant part:

"D.  WHO IS INSURED

1.  You or any family member.

2.  Anyone else occupying a covered auto or a temporary substitute for a covered auto. . . .

3.  Anyone for damages he is entitled to recover because of bodily injury sustained by another insured."

The term "you" is defined in the policy as "mean[ing] the person or organization shown as the named insured in ITEM ONE of the declarations."  The limit of liability set forth states in pertinent part:

"E.  OUR LIMIT OF LIABILITY

1.  Regardless of the number of covered autos, insureds, claims made or vehicles involved in the accident, the most we will pay for all damages resulting from any one accident is the limit of UNINSURED MOTORISTS INSURANCE shown in the declarations.

2.  Any amount payable under this insurance shall be reduced by:

a.  All sums paid or payable under any workers' compensation, disability benefits or similar law, and

b.  All sums paid by or for anyone who is legally responsible, including all sums paid under the policy's LIABILITY INSURANCE."

Howell contends that the policy is ambiguous.  He further contends that a premium has been charged for each vehicle.  Thus, he would multiply the coverage per vehicle by the number of vehicles.

We have dealt with stacking previously.  *See, e.g., Rafferty v. Allstate Ins. Co.*, 303 Md. 63, 492 A.2d 290 (1985); *Yarmuth v. Gov't Employees Ins. Co.*, 286 Md. 256, 407 A.2d 315 (1979); and *Travelers Ins. Co. v. Benton*, 278 Md. 542, 365 A.2d 1000 (1976).  This, however, is an issue of first impression in the appellate courts of this State.

Howell relies upon *Langston v. Allstate Ins. Co.*, 40 Md.App. 414, 392 A.2d 561 (1978), a case which we have

expressly disapproved. See *Rafferty*, 303 Md. at 72, 492 A.2d at 295, and *Yarmuth*, 286 Md. at 265 n. 3, 407 A.2d at 319 n. 3.

There is a decided split of authority around the country on intra-policy stacking. See Note, *Intra-Policy Stacking of Uninsured Motorist and Medical Payments Coverages: To Be Or Not To Be*, 22 S.D.L.Rev. 349, 351 n. 10 (1977). In fact, that note indicates that as of the time it was written of twenty-three states dealing with the question of intra-policy stacking thirteen had refused to allow such stacking. However, in dealing with the question of whether a claimant-employee should be permitted to stack the coverages provided under a commercial fleet policy insuring several vehicles for which separate premiums were paid, the courts are virtually unanimous. Cases not permitting stacking include: *Fuqua v. Travelers Ins. Co.*, 734 F.2d 616 (11th Cir.1984); *Guarantee Ins. Co. v. Anderson*, 585 F.Supp. 408 (E.D.Pa.1984); *Burke v. Aid Ins. Co.*, 487 F.Supp. 831 (D.Kan.1980); *Lambert v. Liberty Mutual Insurance Company*, 331 So.2d 260 (Ala.1976); *Marks v. Travelers Indem. Co.*, 339 So.2d 1123 (Fla.Dist.Ct.App.1976); *Travelers Ins. Co. v. PAC*, 337 So.2d 397 (Fla.Dist.Ct.App.1976); *Ohio Cas. Ins. Co. v. Stanfield*, 581 S.W.2d 555 (Ky.1979); *Burns v. Fernandez*, 401 So.2d 1033 (La.Ct.App.1981); *Linderer v. Royal Globe Ins. Co.*, 597 S.W.2d 656 (Mo.Ct.App. 1980); *Utica Mut. Ins. Co. v. Contrisciane*, 504 Pa. 328, 473 A.2d 1005 (1984); *Cunningham v. Ins. Co. of N. America*, 213 Va. 72, 189 S.E.2d 832 (1972). To the contrary are *Boroos v. Roseau Agency, Inc.*, 345 N.W.2d 788 (Minn.App.1984); *Lundy v. Aetna Cas. & Sur. Co.*, 92 N.J. 550, 458 A.2d 106 (1983); and *American States Ins. v. Milton*, 89 Wash.2d 501, 573 P.2d 367 (1978). *Anderson*, 585 F.Supp. 408, noted at 413 n. 3, that the New Jersey Legislature amended its uninsured motorist statute to reverse the result in *Lundy* for accidents occurring after January 1, 1984.

J. Appleman, *Insurance Law and Practice*, § 5106 (1981), has written on the subject:

"Ordinarily, when a company issues a single policy insuring more than one vehicle, the insured secures a preferential or discounted rate. Irrespective of this consideration, when a single policy is issued, covering more than one vehicle, the proper rule seems to be that the limit prescribed as to UM coverage—that is, the designated limit—controls in any single occurrence whether one, or more than one, person is injured; that is, if the policy is 10/20, the 10 applies to one person, the 20 to all injured in that occurrence. This is not increased, ordinarily, either by statute or by a separability clause; and, despite the confusion of some courts which seem to feel that, somehow, the insurer is deriving an unwarranted windfall, the proper rule remains that liability is not increased by the fact that a separate premium was charged for each such coverage relating to the several vehicles, or for nonowned coverage. Where one does insure several vehicles, but is not driving or riding in one of them at the time of injury by an uninsured motorist (he may either be a passenger in another's automobile, or driving a nonowned vehicle), the highest single limit of liability obtaining as to any one of his insured vehicles will apply to protect him. Such is generally expressly stated in the policies, and the policy limits cannot then be cumulated to arrive at a different result." *Id.* at 528–33 (footnotes omitted).

Appleman deals in § 5101 with the argument made by Howell here that a premium has been paid for an uninsured motorist endorsement for each vehicle:

"Let us take, as a starting point, a fleet, or several vehicles, policy issued to a single insured. If we desire to carry this to a point of absurdity, let us say that the policyholder is a city, owning a thousand automobiles, with an uninsured motorist coverage of $50,000. If we said that the risk, in any one collision, then would be the cumulative total, or stacked coverage, in any one incident the company's exposure would be 50 million dollars as to each vehicle—an absurdity, which no company could pos-

sibly afford to insure. Yet, pursuing the logic indulged in smaller risk cases some decisions have reached precisely that result.

"If that were reasonable, then we should say that the liability exposures should be similarly stacked; and if the liability limit were one million dollars, the exposure automatically would become one billion. No such contention ever has been made, to the knowledge of the authors, nor is it likely that any court would proceed to such length. If it is not reasonable to argue for a doubling or tripling of liability limits when there is a single policy owner, and a single company, then it is not reasonable to urge such a position for uninsured motorist coverages. Yet, as we shall see, the majority of courts have confused themselves upon this issue, feeling that unless they double up such UM coverage, the insurer somehow receives a windfall, since it charges a separate premium for each coverage as it applies to a separate automobile.

"Let us analyze this reasoning, for a moment. If there were but a single insured, and only he ever drove an automobile, obviously he can drive only one vehicle at a time and the reasoning of such courts might then be logical. But, in considering basic underwriting and the actuarial computation of rate structures, we must take into consideration the customary procedures of mankind. Automobile policies are now written so as to afford liability protection not only to the named insured, who is usually the owner, but to members of his family, perhaps persons residing in the same household, and—with a few exceptions—anyone operating with the permission of the named insured or adult members of his household. When it comes to UM coverages, we have a like multiplication of exposure, since we have classes of risk, including all of the persons stated above, and pedestrians as well, with benefits granted in many circumstances when one may be in another vehicle or even upon the highway.

"When the insured then owns more than a single vehicle, almost always it is with the contemplation that the

second, or third, vehicles will be operated by others. And those others may, also, if injured by an uninsured motorist, expose the insurer to loss under that aspect of the contract.

"Now it could not reasonably be argued that an insured owning several automobiles could insure only one of them for liability, or for collision, or comprehensive, damages— yet collect as to any loss inflicted by, or upon, any of those vehicles he elected not to insure. Yet this is precisely the result for which policyholders, or their counsel, contend under UM coverages and which has been upheld repeatedly by the courts. Similarly, it is no more logical to double, or triple, a single limit of UM coverage, the amount of which the insured deliberately selected, and tender it free to the insured.

"We may summarize the situation where there is a single policy owner, single company, and multiple vehicles by saying that the proper result is: 'What you buy is what you get—and no more.' It is time for those courts, which have been so generous with the funds of others, to take a new look at this problem." *Id.* at 444–51 (footnotes omitted).

Views similar to that expressed by Appleman relative to the high exposure for a small premium have been expressed in *Lambert,* 331 So.2d at 265; *Travelers Ins. Co.,* 337 So.2d at 399; *Burns,* 401 So.2d at 1037; *Linderer,* 597 S.W.2d at 661; and *Cunningham,* 213 Va. at 74 and 76, 189 S.E.2d at 834–35. The Kentucky court in *Ohio Cas. Ins. Co.,* 581 S.W.2d at 559, quoted reasoning to that effect.

A total of 19 vehicles were insured. Applying the mathematics mentioned by Appleman and certain of the cases we would find that if Howell's contentions were to prevail there would be an exposure for each vehicle of $950,000 (19 × $50,000). If all 19 vehicles were on the road at one time the total exposure of the insurance company would be $18,050,000 (19 × $950,000). All of this coverage would be available for a premium of $76. This would be a truly absurd result.

Where there is no ambiguity in an insurance contract the court has no alternative but to enforce the policy's terms. Words are to be given their customary, normal meaning when insurance contracts are interpreted. *DeJarnette v. Federal Kemper Ins. Co.*, 299 Md. 708, 721, 475 A.2d 454, 461 (1984), and *Aragona v. St. Paul Fire & Mar. Ins.*, 281 Md. 371, 375, 378 A.2d 1346, 1348 (1977). Under uninsured motorists insurance the policy clearly states $50,-000 as "the most we will pay for any one accident or loss." As indicated, the limit of liability paragraph in the uninsured motorists endorsement says, "Regardless of the number of covered autos, insureds, claims made or vehicles involved in the accident, the most we will pay for all damages resulting from any one accident is the limit of UNINSURED MOTORISTS INSURANCE shown in the declarations." We see no ambiguity notwithstanding arguments of Howell to the contrary. If, however, there were an ambiguity, the doctrine of avoiding absurd results would prevail. The limit is $50,000. Accordingly, we respond in the negative to the question as to whether the insurance policy issued to Pritchett and Maryland law permit the stacking or aggregating of uninsured motorists coverage under the facts of this case.

QUESTION OF LAW ANSWERED AS HEREIN SET FORTH; COSTS TO BE EQUALLY DIVIDED.