683 A.2d 789

Carl Jeffrey **HICKEY**, et al.

v.

Herbert Richard **KENDALL**, et al.

No. 776, Sept. Term, 1995.

Court of Special Appeals of Maryland.

Aug. 28, 1996.

Reconsideration Denied Oct. 29, 1996.

578

**580**

Ronald G. DeWald (Leonard L. Lipshultz, Victor I. Weiner and Lipshultz and Hone, on the brief), Silver Spring, for appellant Hickey.

Donald J. Caulfield (John D. Holler and Caulfield and Holler, on the brief), Mt. Rainier, for appellant Nationwide.

Robert A. Meier, Jr., Damascus, for appellee Herbert Kendall.

James Debelius (Debelius, Clifford, Debelius, Crawford & Bonifant, L.L.C., Gaithersburg, John J. Dillon, Washington, DC, on the brief), for appellee Shirley Kendall.

Argued before HARRELL, SALMON, and PAUL E. ALPERT (Retired, Specially Assigned), JJ.

SALMON, Judge.

On April 26, 1991, appellee Shirley Kendall ("Shirley") was involved in an accident with a vehicle driven by Carl Hickey ("Hickey"). Shirley, at the time of the accident, was driving a 1986 Pontiac with her husband, appellee Herbert Richard Kendall ("Herbert"), sitting next to her. As a result of this accident, Herbert filed suit in the Circuit Court for Montgomery County against Shirley and Hickey.[1] Shirley, for her part, filed a cross-claim against Hickey, wherein she alleged that as a result of Hickey's negligence she was injured. She asked for both compensatory and punitive damages against Hickey. In addition, Shirley's cross-claim sought indemnification and/or contribution from Hickey in the event that she was held liable for her husband's injuries. Hickey, in turn, filed a cross-claim against Shirley praying for indemnification and/or contribution in the event Herbert recovered damages against him.

Shirley and Herbert each suffered extensive injuries as a result of the April 26, 1991 accident. Hickey's vehicle was covered by a policy issued by the Maryland Automobile Insurance Fund ("MAIF"), which had bodily injury liability limits of only $20,000 per claimant, $40,000 per accident. As a result of these low limits, Shirley made a claim against Nationwide Mutual Insurance Company ("Nationwide"), her insurer, under the uninsured/underinsured ("U/M") portion of her policy.[2]

---

1. Herbert sought compensatory and punitive damages against Hickey but sued Shirley only for compensatory damages.

2. *Underinsured* motorist coverage "applies when an insured is involved in an accident with a motorist, who may carry extensive liability insurance far in excess of any amounts statutorily required, but whose

Shirley claimed that, even though she was driving a vehicle with $20,000/$40,000 U/M coverage at the time of the accident, she was entitled to the U/M coverage of $100,000/$300,000 that applied to her 1975 Chevrolet Cavalier. Alternatively, she claimed that Nationwide had breached the duty, set forth in Maryland Code, Article 48A, section 541(c)(2)(ii) (1957, 1994 Repl.Vol.), to offer her, in writing, the opportunity to contract for U/M coverage equal to the $100,000/$300,000 liability coverage on the 1986 Pontiac.

Nationwide, for its part, denied coverage to Shirley but was granted leave to intervene in the pending tort action as a party defendant. Nationwide contended that it had complied with the requirements of Article 48A, section 541(c)(2)(ii) and that the U/M limits applicable to the subject accident were the same as Hickey's liability limits.

On February 5, 1992, Shirley filed a pleading entitled "Motion for Partial Summary Judgment Involving Declaratory Relief as to Uninsured Motorist Coverage" against Nationwide. Shirley contended in her motion that her policy allowed her to select the highest U/M coverage available for any of the three cars that were covered by the Nationwide policy. Herbert eventually also made a claim against Nationwide, which was similar to Shirley's, and he moved for summary judgment against Nationwide on the same ground as his wife.

A hearing was held on the summary judgment motions on May 14, 1992. The trial judge granted the relief sought by Shirley and Herbert, saying, "I am going to grant [the] Motion [for partial summary judgment], the coverage is a hundred [thousand dollars per claimant]."

---

liability coverage is less than the insured's underinsured motorist coverage." *Hoffman v. United Services Automobile Association,* 309 Md. 167, 174, 522 A.2d 1320 (1987).

In contrast, *uninsured* coverage applies when an insured is involved in an accident with a motorist who is either uninsured or who has policy limits that are below the statutory minimum. *Id.* In this opinion, the initials U/M mean uninsured/underinsured motorist coverage.

After ruling against Nationwide on the coverage issue, the court bifurcated the tort case. A jury trial commenced on August 23, 1993, devoted exclusively to the issue of liability. The jury, after a four-day trial, concluded that Hickey's negligence caused the subject accident and that Shirley was not negligent. Hickey filed a Motion for Judgment Notwithstanding the Verdict, which was denied. Subsequently, on March 20, 1995, Judge Leonard Rubin presided at a bench trial that dealt solely with the issue of damages. The court awarded $100,000 to Shirley and $81,551.91 to Herbert as damages. After these judgments were entered in favor of Shirley and Herbert and against Hickey, Nationwide and Hickey both filed appeals, and Herbert filed a timely cross-appeal.

The insurance coverage issue raised by Nationwide in this appeal is:

Did the trial court err in finding that Mr. and Mrs. Kendall were each entitled to the $100,000 underinsured [U/M] coverage limits purchased in connection with a 1975 Chevrolet, even though at the time of the subject accident they were in a 1986 Pontiac, which had much lower limits, but was insured under the same policy?

We answer "Yes" to this question. As a result, this case must be remanded so that the court can rule on the Kendalls' claim that the applicable U/M limits were $100,000/$300,000 because (allegedly) Nationwide failed to notify them that they could contract for U/M coverage on the 1986 Pontiac that was equal to their liability limits. Also presented are several more mundane issues that concern the conduct of the negligence phase of the lawsuit.

## I. COVERAGE ISSUES

The 1986 Pontiac that Shirley was driving at the time of the accident, like two other cars owned by the Kendalls (a 1978 Chevrolet and a 1975 Chevrolet), was insured through Nationwide. The Nationwide policy declaration set forth the following coverages:

| Veh | Make | Year | Veh | Make | Year | Veh | Make | Year |
|---|---|---|---|---|---|---|---|---|
| # 1 | Pont. | '86 | # 2 | Chev. | '78 | # 3 | Chev. | '75 |

| | | | |
|---|---|---|---|
| U/M [3] | $ 20,000/40,000 | $ 20,000/40,000 | $100,000/300,000 |
| BI [4] | 100,000/300,000 | 100,000/300,000 | 100,000/300,000 |
| PD [5] | 10,000 | 10,000 | 50,000 |

The premium for six months U/M coverage on the 1986 Pontiac and the 1978 Chevrolet was $11.80 each, and the six-month U/M premium for the 1975 Chevrolet was $22. Shirley contends that, as to her, the U/M coverage is "personal" and she should be allowed to select the highest coverage. She acknowledges that everyone else who makes a U/M claim under the policy is subject to the U/M limits applicable to the insured automobile occupied at the time of injury.

Herbert takes a broader view. He claims that the U/M coverage is "personal" to himself and Shirley but "vehicle specific" to everyone else who claims U/M coverage under the policy.

The insuring agreement in the Kendalls' Nationwide policy provided:

> For your payment of premiums in amounts we require and subject to all of the terms and conditions of this policy, we agree to provide the coverages you have selected. Your selections are shown in the attached Declarations, which are a part of this policy contract. . . .

Under the policy, the term "uninsured motor vehicle" is defined to include:

> [A]n underinsured motor vehicle. This is one for which there are bodily injury liability coverage or bonds in effect. Their total amount, however, is less than the limits of this coverage. These limits are shown in your policy's Declarations.

3. Underinsured/uninsured coverage.

4. Bodily injury liability coverage.

5. Property damage liability coverage.

The "U/M" coverage itself is described by the following policy language:

Under this coverage we will pay all sums for bodily injury and property damage that you [defined as the policyholder first named in the Declarations (here, Mrs. Kendall) and includes that policyholder's spouse (Mr. Kendall) if living in the same household] or your legal representative are legally entitled to recover as damages from the owner or driver of an uninsured motor vehicle. Damages must result from an accident arising out of the ownership, maintenance, or use of the uninsured motor vehicle. * * * *

Bodily injury means bodily injury, sickness, disease, [or] death. Relatives living in your household also are covered for bodily injury damages under this coverage. Anyone else is protected while occupying:

1. Your auto. * * * *

2. any other motor vehicle while it is being operated by you. However, the vehicle must not be owned by or furnished to you or a relative living in your household for regular use. * * * *

**LIMITS AND CONDITIONS OF PAYMENT—— AMOUNTS PAYABLE FOR UNINSURED MOTORISTS LOSSES.** Our obligation to pay uninsured motorists losses is limited to the amounts per person and per occurrence stated in the attached Declarations. The following conditions apply to these limits: * * * *

3. The insuring of more than one person or vehicle under this policy does not increase our Uninsured Motorists payment limits. Limits apply to each insured vehicle as stated in the Declarations. In no event will any insured be entitled to more than the highest limit applicable to any one motor vehicle under this or any other policy issued by us.

We begin by discussing the general prohibition against the "stacking" (or aggregation) of coverage, a topic that is related to—although distinguishable from—the issue we must decide. The seminal "stacking" case in Maryland is *Howell v. Harleysville Mutual Insurance Co.,* 305 Md. 435, 505 A.2d 109 (1986). John Howell, while driving a van owned by his employer (the Pritchett Transportation Company, Inc., hereinafter, "Pritch-

ett"), was severely injured in a collision with an uninsured motor vehicle. Pritchett owned a fleet of 19 vehicles, all of which were insured through the Harleysville Mutual Insurance Company ("Harleysville"); nevertheless, Pritchett's U/M coverage with Harleysville specified that "the most that will be paid for any one accident or loss is $50,000." *Id.* at 437, 505 A.2d 109. Howell argued that the $50,000 limit applied to *each* vehicle in Pritchett's fleet and that, therefore, Pritchett's total available U/M coverage for his particular accident was *$950,000.* In other words, Howell sought to "stack" Pritchett's U/M benefits, a practice that the Court of Appeals held violated both the clear language of the governing policy and— more important—common sense:

> A total of 19 vehicles were insured. Applying the mathematics ... we would find that if Howell's contentions were to prevail there would be an exposure for each vehicle of $950,000 (19 X $50,000). If all 19 vehicles were on the road at one time the total exposure of the insurance company would be $18,050,000 (19 X 950,000). All of this coverage would be available for a premium of $76. This would be a truly absurd result.

*Id.* at 442, 505 A.2d 109. The holding in *Howell* was concise: "We shall hold in this case that there cannot be intra-policy 'stacking' or pyramiding of uninsured motorists benefits." *Id.* at 436, 505 A.2d 109.

A similar result was reached in *Hoffman v. United Services Automobile Association,* 309 Md. 167, 522 A.2d 1320 (1987), a case that presented facts analogous to those in *Howell.* In *Hoffman,* the Court of Appeals stated:

> In our opinion, the *Howell* decision controls the present case.... The declarations page provides limits of $300,000 for each person and $500,000 for each occurrence. The endorsement further states that these limits "shall be the total limit of the company's liability for all damages because of bodily injury." * * * *

In sum, the principles established in [*Howell*] preclude stacking the underinsured motorist coverage in this case.

309 Md. at 182–83, 522 A.2d 1320.

By applying the holdings of *Howell* and *Hoffman* to the case at bar, we note that Herbert and Shirley Kendall would have been precluded from "stacking" the Nationwide coverage on their three vehicles to obtain a total "stacked" per person coverage of $140,000 ($20,000 from the 1986 Pontiac, plus $20,000 from the 1978 Chevrolet, plus $100,000 from the 1975 Chevrolet). Stacking their coverages, however, is *not* what the Kendalls are currently seeking to do. Rather, they seek to "blend" their coverages, *i.e.*, they seek to be able to *select* the vehicle under the policy that will provide maximum coverage, as opposed to combining the full limits of all available policies. The appellate courts of this state have never specifically addressed the propriety of blending coverages.

Before deciding whether "blending" of policy limits is allowable, it is important to remember the reason why insurers charge additional premiums for each additional vehicle insured. In 8C APPLEMAN, INSURANCE LAW AND PRACTICE, § 5101, at 444–451 (1981), the author provides an explanation of this principle, which was quoted in both *Howell*, 305 Md. at 441–42, 505 A.2d 109, and *Hoffman*, 309 Md. at 181–82, 522 A.2d 1320:

But, in considering basic underwriting and the actuarial computation of rate structures, we must take into consideration the customary procedures of mankind. Automobile policies are now written so as to afford liability protection not only to the named insured, who is usually the owner, but to members of his family, perhaps persons residing in the same household, and—with a few exceptions—anyone operating with the permission of the named insured or adult members of his household. When it comes to UM coverages, we have a like multiplication of exposure, since we have classes of risk, including all of the persons stated above, and pedestrians as well, with benefits granted in many circum-

stances when one may be in another vehicle or even upon the highway.

When the insured then owns more than a single vehicle, almost always it is with the contemplation that the second, or third, vehicles will be operated by others. And those others may, also, if injured by an uninsured motorist, expose the insurer to loss under that aspect of the contract.

The declarations sheet in the Nationwide policy stated that, "Premium is based on use of vehicle." The use of the vehicle was listed as "Pleasure" for all three vehicles. The "rated driver" for the 1986 Pontiac was Shirley, who was described as an "adult—female" eligible for a "senior discount"; the "rated driver" for the 1978 Chevrolet was Herbert, described as an "adult male" also eligible for a "senior discount" [6]; the rated driver for the 1975 Chevrolet with the $100,000/$300,000 U/M limits was described as "male, age 21, married." As can be seen, by insuring three vehicles, Nationwide had greater risk than if it insured only one. The $22 premium on the 1975 Chevrolet paid for, *inter alia,* "the increased risk of the added passengers and miles." *Hoffman, supra,* 309 Md. at 183, 522 A.2d 1320. The increased premium on that vehicle also reflected that it would be operated by someone other than Shirley or Herbert and that Nationwide would have higher U/M exposure than on the other two vehicles.

In *Powell v. State Farm Ins. Co.,* 86 Md.App. 98, 585 A.2d 286 (1991), the insured was involved in an accident with an uninsured motorist while driving his wife's vehicle, which had U/M limits of $20,000/$40,000. *Id.* at 100, 585 A.2d 286. The insured also owned another vehicle, not involved in the accident, covered by a separate policy with $100,000/$300,000 uninsured motorist coverage. The separate policy with the higher limits excluded:

> BODILY INJURY TO YOU ... WHILE OCCUPYING
> ... A MOTOR VEHICLE OWNED BY YOU, YOUR

---

6. Both Mr. and Mrs. Hickey are over 55 years old.

SPOUSE OR ANY RELATIVE, and which is not insured under the liability coverage of this policy.

*Id.*

In *Powell,* the insured contended that the exclusion was inapplicable because "the mandatory Maryland coverage extends to any vehicle being driven by [him] as a named insured." *Id.* at 101, 585 A.2d 286. Therefore, the insured asserted, he had U/M coverage even while driving his wife's vehicle. We rejected that contention and interpreted the exclusion as meaning that the second policy did not "apply if he was occupying a motor vehicle owned by his wife that was not described as an insured vehicle in his policy." *Id.* at 103, 585 A.2d 286. We said:

> To apply its language as the appellant urges would invite multi-vehicle families to insure only one vehicle. It would play havoc with premium determinations and otherwise be detrimental to the process of proving liability protection to the motorists, and others, of Maryland. Appellant's interpretation of the clause, if adopted would be, as we see it, contrary to public policy.
>
> As far as we have been able to determine, the prior cases voiding exclusionary language in respect to uninsured motorist UM coverage and personal injury protection (PIP) have not voided a provision that excludes coverage for a *vehicle* owned by the insured or his spouse which is not insured under the policy.

*Id.* at 107–108, 585 A.2d 286 (footnotes omitted).

We continued:

> We think that the doctrine of avoiding absurd results is also applicable. The policy at issue in *Howell,* 305 Md. at 442–43, 505 A.2d 109, covered 19 separate vehicles. The issue before the court was the existence (or lack thereof) of intra-policy "stacking" of coverage. After referring to the possibility of absurd results mentioned in J. Appleman, *Insurance Law and Practice* § 5106 (1981), the Court stated:

Views similar to that expressed by Appleman relative to the high exposure for a small premium have been expressed in [several other cases]. The Kentucky court in *Ohio Cas. Ins. Co. [v. Stanfield]*, 581 S.W.2d [555] at 559 (Ky.1979), quoted reasoning to that effect.

\*　　\*　　\*　　\*　　\*　　\*

To hold as appellant also urges, *i.e.*, that his wife's vehicle was not *uninsured* because it was covered under another policy, would be to permit an owner to buy excess coverage under one policy for one vehicle at a relatively small premium and coverage under a separate policy for his other vehicles at a lesser cost, and have the excess coverage of the first policy apply to the vehicles covered under the subsequent policies.

*Id.* at 109–10, 585 A.2d 286 (footnote omitted).

The doctrine of avoiding absurd results, discussed in *Powell, supra,* and *Howell, supra,* comes into play when considering the Kendalls' interpretation of the policy. Multi-vehicle owners could "play havoc with rate determinations" by the simple expedient of insuring one vehicle for high U/M coverage limits and insuring the remaining vehicles with the lowest possible U/M coverage. Although the premiums on each automobile are based on the type of use of that vehicle and coverage limits apply to each insured vehicle, under the Kendalls' theory, the named insured and their spouses would always be entitled to the higher coverage. This would include any vehicle involved in the accident with the uninsured or underinsured motorist, and they would have zero incentive to have higher U/M coverage for the remaining vehicles. This result would be at least as absurd as the result rejected in *Powell.*

In their briefs, both the Kendalls and Nationwide give strict scrutiny to each of the three sentences in condition 3 regarding the payment of U/M benefits. Sentence one: "The insuring of more than one person or vehicle under this policy does not increase our uninsured motorist payment limits." Sentence three: "In no event will any insured be entitled to more than the highest limit applicable to any one motor vehicle

under this or any other policy issued by us." Sentences one and three prohibit both intra-policy and inter-policy stacking but do not help resolve the issue presented.

Sentence two: "Limits apply to each insured vehicle as stated in the Declarations." The U/M coverage to be applied to the 1986 Pontiac is $20,000/$40,000. In regard to the 1986 Pontiac, the declarations sheet says that the "premium [of $11.80] is based on use of vehicle," and the insuring agreement provides, in pertinent part, "For your payments of premiums in amounts we require and subject to all conditions of the policy, we agree to provide the coverages you have selected." Reading these provisions in tandem, we conclude that the policy unambiguously limits U/M coverage for persons occupying the 1986 Pontiac, at the time they are injured by the negligence of an uninsured or underinsured motorist, to $20,000/$40,000 coverage limits. The obvious purpose of sentence two was to make sure that all persons who made U/M claims while occupying an insured vehicle would be restricted to the coverage provided for that vehicle.

We find support for our holding in the case of *Nationwide Insurance Company v. Hecker*, 183 Ill.App.3d 13, 131 Ill.Dec. 721, 538 N.E.2d 1277 (1989). The *Hecker* case focused on an insurance policy, which, in all material respects, was identical to the one issued to the Kendalls. Gerald Hecker, a Nationwide insured, was driving a 1984 Chevrolet Cavalier when it was involved in an accident with an uninsured motorist. *Id.*, 131 Ill.Dec. at 721, 538 N.E.2d at 1277. The Cavalier had U/M coverage of $50,000 for each person and $100,000 for each occurrence, but a Corvette and a Celebrity, which were insured under the same policy, had $100,000/$300,000 U/M limits. *Id.*, 131 Ill.Dec. at 722, 538 N.E.2d at 1278. The Heckers acknowledge that they could not stack their coverages but claimed they could select which coverage should be applied. They (naturally) selected the U/M coverage for one of the vehicles with $100,000/$300,000 U/M limits, rather than the lower limits for the Cavalier. The Nationwide policy issued to the Heckers contained a clause that was identical to Clause 3 found in the Kendalls' policy, and the counterpart to

Clause 3 was the focus of the Court's decision. The *Hecker* Court rejected the contention that the insured could select the highest coverage and held that the policy was unambiguous.[7] *Id.*, 131 Ill.Dec. at 723, 538 N.E.2d at 1279. The Court stated:

In the instant case, paragraph two[8] of the policy states that the "[l]imits apply to each insured vehicle as stated in the Declarations." The declaration sheet provides that the

---

**7.** Although the language used in the insurance policy construed in *Makela v. State Farm Mut. Auto. Ins. Co.*, 147 Ill.App.3d 38, 100 Ill.Dec. 505, 497 N.E.2d 483 , *cert. denied*, 113 Ill.2d 560 (1986), is somewhat different from that at issue here, the facts, logic, and holding in that case are similar to those in *Hecker.* In *Makela,* the plaintiff was injured in an automobile accident while a passenger in a 1979 Datsun owned by one Harry Shank. The Shank vehicle was insured by Central Security Mutual Insurance Co. (Central). *Id.*, 100 Ill.Dec. at 506, 497 N.E.2d at 484. Central issued an insurance policy to Mr. Shank providing U/M coverage for the Datsun of $15,000 per person, $30,000 per occurrence ($15,000/$30,000) and coverage for a 1977 Oldsmobile of $50,000 per person and $100,000 per occurrence ($50,000/$100,-000). *Id.*, 100 Ill.Dec. at 507, 497 N.E.2d at 485. Plaintiff contended that the policy was ambiguous and that she was entitled to coverage on the higher limits even though she was, at the time of her injury, a passenger in a car with only $15,000/$30,000 U/M limits. The *Makela* Court held:

As to plaintiff's ambiguity argument, the policy language which limits the amount of recovery states, "The limit of uninsured motorist insurance shown on the Declaration Page for 'each person' is the maximum we'll pay in Damages for bodily injury to any one person * * * * Even though You may have more than one car insured with us and separate premium are charged for each car, the most we will pay for any one accident is the amount shown on the Declaration Page. . . ." Another clause in the policy promises to pay uninsured motorist insurance "* * * *because of bodily injuries You suffer while Occupying a Car we insure * * *. . . ." Read as a whole, the above provisions in tandem with the separate listings of coverages for each of three automobiles on the declaration page unambiguously indicate that coverage is limited to the amount listed for the automobile involved in the accident. Where a clause is unambiguous, there is no need for construction, and the clause may be applied as written. (*Menke v. Country Mutual Insurance Co.* (1980), 78 Ill.2d 420, 423–24, 36 Ill.Dec. 698, 700, 401 N.E.2d 539, 541.) Accordingly, the trial court's determination that plaintiff is limited to the $15,000 uninsured motorist coverage listed for the Datsun was proper.

*Id.*, 100 Ill.Dec. at 513–14, 497 N.E.2d at 491–92.

**8.** "Paragraph 2" contains the same wording as Condition 3 in the policy issued to the Kendalls.

coverages and limits "apply to each insured vehicle as indicated" in the schedule of coverages. The Celebrity and the Corvette each have coverage limits of 100/300, and each has a premium of $7. The Cavalier had coverage limits of 50/100 and a premium of $3.30. *Reading paragraph two in conjunction with the declarations sheet, we conclude that the policy unambiguously limits coverage to the amount listed for the vehicle involved in the accident.* Consequently, defendants were entitled to 50/100 coverage and not 100/300 coverage. Since there are no issues of fact, plaintiff is entitled to summary judgment as a matter of law.

(Emphasis added.)

Shirley contends that sentence two of clause three has the following meaning:

The specific amount of the coverage limit per insured vehicle is stated on the premium page, subject to other policy terms (namely, that UM coverage is personal to a "named insured," but vehicle specific to "anyone else")....

As mentioned earlier, Shirley, as the "named insured," contends that only she is entitled to "blending." [9]

Herbert argues:

[T]he policy distinguishes between the coverage for the policyholder and the policyholder's spouse, on the one hand, and "anyone else" on the other hand. The policy covers all damages for the policyholder and spouse which each is legally entitled to recover from the owner or the driver of the uninsured motor vehicle. This is true whether the policyholder/spouse is occupying his or her own motor vehicle, someone else's motor vehicle or is a pedestrian. Persons in the "anyone else" category only have coverage while *occupying* the policyholder's car.

As can be seen by a review of the portion of the policy already quoted, Nationwide's policy distinguishes between the

---

**9.** Shirley asserts in her brief, "Shirley, as the 'named insured,' unlike 'anyone else,' had coverage which was personal to her, i.e., she was not required to occupy any specific vehicle to be entitled to coverage."

policyholder first named in the Declaration page (Shirley), her spouse (Herbert), and relatives of the Kendalls living in their household on the one hand and "everyone else" on the other. The first group (Shirley et al.) can make an U/M claim for all sums they are legally entitled to recover for bodily injuries resulting from an accident "arising out of the ownership, maintenance or use of an uninsured motor vehicle." The second group ("everybody else") can make the same type of U/M claim but only if they are injured by the negligence of an uninsured motorist while they are occupying 1) one of the three vehicles mentioned in the Declarations sheet or 2) any other vehicle while it is being operated by Shirley or Herbert, so long as the vehicle the Kendalls are occupying is neither owned by the Kendalls (or a relative living in their household) or furnished for their regular use. Therefore, the policy is not, as Shirley contends, "personal" to a named insured, but "vehicle specific" to "anyone else." Moreover, it is not true, as Herbert contends, that a person in the "anyone else" category only has "coverage while occupying the policyholder's car."

The Kendalls cite only one case in support of their contention that "blending" is permissible. That case is *Branch v. O'Brien*, 396 So.2d 1372 (La.Ct.App.), *cert. denied*, 400 So.2d 905 (La.1981). Unlike the case *sub judice*, *Branch* did not deal with the interpretation of a contractual provision in an insurance policy but dealt with the issue of whether a provision in the Louisiana Insurance Code that prohibited stacking changed the previous rule of law that policy clauses excluding coverage while an insured is occupying an automobile not listed in the policy are void. *Id.* at 1375–76. In *Branch*, the plaintiff insured four cars with State Farm Insurance Company under four separate policies. *Id.* at 1374. The first three cars carried U/M coverage of $10,000/$20,000, while the fourth car had a policy with $100,000/$300,000 U/M limits. *Id.* Plaintiff was driving one of the cars with the lower limits when she was involved in an accident with an uninsured motorist. *Id.* All four policies had a U/M exclusion, which stated that the policy did not apply to "an insured while occupying an

automobile (other than an insured automobile) owned by the named insured...." *Id.*

The *Branch* Court held that the exclusion was void as against Louisiana public policy and allowed the plaintiff to choose the policy with the highest U/M limits, even though she was not driving or occupying it when injured. *Id.* at 1375–76. Inasmuch as no one contends that any part of Nationwide's policy is void as against public policy, Branch is inapposite.

Furthermore, *Branch*'s precedential value is doubtful even in Louisiana. The trial court in *Branch* characterized U/M coverage as "personal" to the insured and held that, for purposes of ascertaining policy limits, it did not matter which vehicle the insured was occupying when the accident occurred. Under Maryland law it does make a difference as to which insured vehicle an insured is occupying when injured by an uninsured motorist. *See Powell, supra. See also Schuler v. Erie Ins. Exchange,* 81 Md.App. 499, 507, 568 A.2d 873 (dicta), *cert. denied,* 319 Md. 304, 572 A.2d 183 (1990). In *Breaux v. Louisiana Farm Bureau Mutual Ins. Co.,* 413 So.2d 988, 993 (La.Ct.App.), *cert. denied,* 420 So.2d 453 (La.1982), the Court said:

> Within the factual context of a motor vehicle owned by the injured party and listed in only one liability insurance policy, we deem the reasoning of *Branch* to be unsound. Where there is more than one liability policy with UM coverage but only one such policy listing the involved vehicle, we conclude the 1977 amendment to the Act does make the coverage under that policy exclusive of the other coverage. We think the amendment clearly provides the policy or coverage on the vehicle in which the owner was insured is the only policy with usable UM coverage. In effect, that policy becomes exclusive.

We hold that the Nationwide policy is unambiguous as it concerns the coverage question here at issue [10] and, according-

---

**10.** Under other factual scenarios, the policy may well be ambiguous in regard to what U/M coverage limit would be applicable, *e.g.,* if Shirley

ly, that the trial court erred in granting summary judgment in favor of the Kendalls and against Nationwide.

This case must be remanded for further proceedings in regard to another issue raised, but not decided, by the circuit court, viz: whether Nationwide breached its duty to offer its insureds the opportunity to contract for U/M coverage equal to the liability coverage on the 1986 Pontiac and, if so, whether that caused the Kendalls to select 20,000/40,000 U/M limits.

## II. *LIABILITY ISSUES*

Five issues, rephrased and reordered for clarity, are raised in this appeal by Hickey:

1. Did the trial court err in denying Hickey's Motion for Judgment Notwithstanding the Verdict (jnov)?

2. Did the trial judge commit reversible error in admitting into evidence portions of Hickey's hospital records dealing with Hickey's use of marijuana and alcohol on the night of the accident?

3. Did the trial judge commit reversible error in admitting into evidence testimony of Dr. Yale Caplan concerning the deleterious effects on driving ability caused by a driver's use of alcohol and/or marijuana?

4. Did the trial judge commit reversible error in admitting into evidence circumstantial evidence of Hickey's marijuana use?

5. Did the trial judge commit reversible error by allowing Hickey to be cross-examined about his consumption, on the day of the accident, of marijuana and alcohol?

Herbert, on cross appeal, raises one issue:

Was Shirley negligent as a matter of law?

---

were injured by the negligence of an uninsured motorist while she was a pedestrian and none of the three insured vehicles were in any way involved.

### A. Testimony at Trial Regarding the Happening of the Accident [11]

Route 27 is a two-lane road with a maximum speed limit of 40 miles per hour. On April 26, 1991 at 8:00 p.m., Hickey was drinking a beer as he drove his pickup truck, at 70 miles per hour, southbound on Route 27. As Hickey approached, Shirley pulled out onto Route 27 with the intent of turning left and proceeding north. At the point where she emerged onto Route 27, Hickey's truck was 431 feet to Shirley's left. Although normal reaction time is .75 seconds, Hickey took about three seconds to react to the danger posed by the entry of Shirley's vehicle onto Route 27. After three seconds, Hickey slammed on his brakes, skidded eighty feet, and struck the left front of Shirley's car. Hickey's pickup, at the moment of impact, was moving at the rate of 56 miles per hour; Shirley's vehicle at that point was partially blocking both the northbound and southbound lanes of Route 27. The force of the impact spun Shirley's vehicle onto the shoulder of the northbound lane where it faced south when it came to rest.

An expert testified at trial that, if Hickey had been going the speed limit at the point where Shirley entered onto Route 27, Shirley's car would have travelled an additional seventy-nine feet and would have cleared the intersection prior to the time Hickey's vehicle reached the point of impact.

### B. Hickey's Alcohol and Drug Consumption

When called as an adverse witness by Herbert, Hickey candidly admitted at trial that he drank "five beers, six beers" between 5:30 p.m. and 8:00 p.m. on the night of the accident. Immediately after the accident, he walked to a nearby store where he purchased gum to conceal the odor of alcohol on his breath. Shortly thereafter, Hickey took a bag of marijuana out of his pocket and gave it to his cousin.

---

11. The facts related in Part II.A. are set forth in the light most favorable to Shirley. Hickey does not admit the truth of many of these facts.

A storekeeper testified at trial that Hickey's eyes were bloodshot and his breath smelled of alcohol immediately after the accident. An investigating police officer testified that he observed Hickey at the accident scene and he noticed that Hickey walked in a "swaying" manner and appeared to be intoxicated.

Another police officer testified that, shortly after the accident, he inspected the cab of Hickey's truck and smelled the odor of "burning" marijuana and found a "water bong," which was "still kind of warm." The bong was observed laying on its side, with the water having spilled out. The officer testified that he was "certain" that the bong had been used for the purpose of smoking marijuana.

### C. *Summary of the Suburban Hospital Records*

Hickey was admitted to Suburban Hospital on April 26, 1991 at approximately 8:30 p.m. An emergency-room physician's initial impression (at 8:40 p.m.) was that Hickey had suffered a "blunt torso trauma." Under the heading "History of Present Illness," the physician noted that the patient was a 26 year-old male, positive for alcohol and marijuana, who had been involved in a motor vehicle accident with no loss of consciousness. Under the heading "Appearance," the physician wrote: "No acute distress—obvious alcohol on breath—uncooperative and sarcastic." Hickey was sent to the X-ray department so that he could be "evaluate[d] for fractures" of the neck, mid and low back, pelvis, hip, sternum, and both ankles. The x-rays were all negative. At 9:00 p.m., Hickey complained of severe pain in his left ankle. Shortly thereafter, a nurse noted that Hickey was "reluctant to cooperate—smell of alcohol. . . ." The hospital, at 9:14 p.m. and 9:15 p.m., drew Hickey's blood in order to perform a total of twenty-seven tests. One of the tests ordered was a "stat alcohol test." Hickey's blood serum alcohol level at 9:15 p.m. was .15, according to the hospital records. The hospital chart shows the results of all the aforementioned blood tests plus the results of many later blood tests but did not indicate when any of the tests were completed. All the test results appear on a

"Discharge Summary Sheet" that says, ambiguously, "run date 4/30/91—0810—For Date: 4/29/91."

About five and one-half hours after his hospital admission (at 2:00 a.m. on April 27), a nurse filled out an assessment sheet. Under the heading "Drug/Alcohol Use," she wrote that Hickey had "last taken" marijuana "last night—4/26" and that he had "last taken" beer on "4/26."

On April 27, Hickey was referred for alcohol and drug counselling at the hospital. A counselor, on April 29, discussed with Hickey possible alcohol and drug treatment. He was given information about the availability of free drug and alcohol treatment programs, which were provided by Montgomery County and by Suburban Hospital. According to the hospital records, this referral was to help the patient "with his alcohol and drug-related problems."

Hickey stayed in Suburban Hospital for three days. He was treated for "multiple trauma injuries" and a right [12] ankle strain. His hospital discharge summary included the following statement:

> *SUMMARY OF HISTORY:* Mr. Hickey is a 26-year-old white male involved in a motor vehicle accident as the driver. He ended up hitting a car that pulled in front of him. *He was under the influence of alcohol and had been smoking marijuana.* However, he denied any loss of consciousness.

(Emphasis added.)

### D. *Testimony of Dr. Yale Caplan*

Dr. Yale Caplan, a forensic toxicologist, testified on behalf of Herbert. Based on the Suburban Hospital records, Dr. Caplan testified that, at the time of the accident, Hickey's

---

12. Mr. Hickey suffered injuries to both ankles as a result of the accident. His initial complaint was for pain in his left ankle. According to his discharge summary, however, he was treated for a right ankle strain.

whole blood alcohol concentration was ".15 percent." [13] To reach such a concentration, a person of Hickey's weight and gender would, at a minimum, have had to have imbibed between "six and seven" twelve-ounce beers. This assumes that no alcohol had been metabolized. According to Dr. Caplan, an alcohol concentration of .15 percent would significantly and adversely affect a person's coordination, gait, balance, speech, depth perception, and ability to think. Dr. Caplan was asked what effect smoking marijuana would have on a motor vehicle operator. He responded:

A Well, those effects are also as a central nervous system depressant and they are essentially similar [to the effect of alcohol consumption] although some are different. There's more of a euphoria than there is with alcohol but insofar as the central nervous system effects, they are very similar to alcohol and it does many of the same things that alcohol does with regard to complex task performance, comprehension and decision making capability. In addition it causes an increased euphoria. It can have effects on heart rate and things like that as well.

Q [COUNSEL FOR SHIRLEY] Well, what then does the combination of alcohol and marijuana from a physiological functional standpoint do?

A Well, in general they would be similar and if one were to have used both substances simultaneously you would have an additive, at least an additive effect and therefore whatever manifestations you would consider at any particular alcohol concentration, in this case we are talking about .15 percent alcohol which would represent a fairly significant marked state of intoxication with significant coordination

---

13. A blood test such as the one performed on Hickey's blood, in which the serum alone is tested, will show a slightly higher alcohol concentration than if the whole blood is tested. On the other hand, the body metabolizes or degrades alcohol over time—at the rate of two-thirds of a drink per hour. There was approximately a 75 minute lapse between the accident and the time the blood serum was drawn. According to Dr. Caplan, the two factors balance each other out and Hickey would have a .15 concentration of alcohol in his whole blood at 8:00 p.m.

difficulties, visual impairment and some of the things we mentioned earlier, and the use of the marijuana would enhance those. If there were sufficient amounts present it would add to that in the same direction and act as if the concentration of alcohol were actually higher than the one that was rendered here, so it would be somewhere between no effect if the concentrations are not significant in the blood to an added effect proportional to the amounts that were present in the blood and the time of use. If the time of use were relatively recent, you know, within the last hour or two you would expect some effects and if they were much further back in time there may be lesser effects but certainly the effects would be similar to alcohol and additive to the alcohol.

Dr. Caplan testified, without objection, that the blood tests were "probably" performed "shortly after" the time the blood was drawn and he had no reason to believe that "the blood alcohol tests results [were] inaccurate."

## III.

Did the trial judge err in denying Hickey's motion for jnov?

■ Hickey's motion for jnov was based on the contention that Shirley was guilty of contributory negligence as a matter of law, and therefore Shirley had no right to recover damages for her personal injuries; furthermore, as to his cross-claim for contribution, Hickey asserted he was entitled to the entry of a judgment against Shirley for contribution as to any judgment that might be entered in favor of Herbert. Significantly, Hickey did not contend in his jnov motion that, as a matter of law, he was free of negligence.[14]

Maryland Rule 2–532(a) reads:

**When Permitted.**—In a jury trial, a party may move for judgment notwithstanding the verdict only if that party

---

14. Hickey, likewise, does not contend on appeal that there was insufficient evidence from which a jury could find that his negligence proximately caused the accident.

made a motion for judgment at the close of all the evidence and only on the grounds advanced in support of the earlier motion.

In *Weathersby v. Kentucky Fried Chicken Co.*, 86 Md.App. 533, 552, 587 A.2d 569 (1991), we stated:

> Under Maryland Rule 2–532, a motion for judgment n.o.v. is evaluated by the trial judge as if it were a motion for judgment made at the close of the evidence. The motion for judgment n.o.v. must be made on the same grounds that were advanced by the moving party seeking judgment under Md. Rule 2–519 at the close of the evidence....

At the close of all the evidence, there were five claims pending, *viz:* 1) Shirley's damage claim against Hickey; 2) Shirley's cross-claim for contribution and/or indemnification against Hickey; 3) Herbert's claim against Shirley; 4) Herbert's claim against Hickey; and 5) Hickey's cross-claim against Shirley for contribution and/or indemnification in the event that Hickey was held liable for Herbert's injuries. If, as a matter of law, Shirley's negligence proximately caused the accident, that fact, standing alone, would not have defeated either Shirley's cross-claim for contribution against Hickey or Herbert's claim against Hickey. A finding that Shirley was negligent as a matter of law would have only defeated Shirley's tort claim for damages and her claim for indemnification against Hickey. Yet, when Hickey moved for judgment at the close of all the evidence, he never made any distinction between the claims. He simply maintained that as a matter of law he was not guilty of primary negligence. Hickey's attorney argued:

> Your Honor, the case is completely in. Other than the sympathy factor and the fact that this man [Hickey] was drinking and driving, all these things are in. But the evidence shows even with Mr. Manning [Shirley's accident reconstructionist], who never even talked about Mrs. Kendall coming across the road, other than if everybody was doing what they were supposed to be doing, this accident would not have happened, including Mrs. Kendall.

I again move for a motion for judgment, Your Honor. Not a directed verdict, a motion for judgment now on the basis of the evidence that is before the Court. I don't think it is proper to let the jury consider this case because of the total of what the plaintiff and Mr. Debelius [Shirley's counsel] talking about nothing but alcohol and drugs and not the facts.

The trial court denied the motion.

Maryland Rule 2–519(a) requires that a party who moves for judgment must "state with particularity all reasons why the motion should be granted." As can be seen from the above excerpt, Hickey's trial counsel did not move for judgment on the same ground as he relied upon in his motion for jnov.

After the court denied Hickey's counsel's motion for judgment, another attorney for Mr. Hickey had the following brief exchange with the trial judge:

Your Honor, at this time we renew our motion and make a motion as to the cross claim of Mr. Hickey.

THE COURT: Denied.

In this last exchange, counsel for Hickey did not state with particularity *any* reason why his motion should be granted.[15]

The purpose of the Maryland Rule 2–519 particularity requirement is to make the trial judge aware of the exact basis for the movant's contention that the evidence is insufficient. *Laubach v. Franklin Square Hospital,* 79 Md.App. 203, 214–215, 556 A.2d 682 (1989). That purpose was not fulfilled by the words used by Hickey's counsel when he moved for

---

**15.** Appellant's counsel's statement that "We renew our motion" is reminiscent of what was said in *Ford v. Tittsworth,* 77 Md.App. 770, 551 A.2d 945 (1989), in which defense counsel said, "But I would like to put on the record just for paperwork and clearing up things that I'm renewing my motion for a verdict in favor of the [defendant] at the conclusion of the entire case." *Id.* at 772, 551 A.2d 945. We held in *Ford, supra,* that counsel's subsequent "renewal" of an earlier motion did not comply with the particularity requirement of Maryland Rule 2–519(a).

judgment in this case. At no time prior to the jnov motion did Hickey's counsel contend that he was entitled to judgment against Shirley based on Shirley's sole negligence.[16] Therefore, the trial judge did not err in denying Hickey's motion for judgment notwithstanding the verdict.

## IV.

Did the trial judge commit reversible error in admitting into evidence portions of Hickey's hospital records dealing with

---

**16.** Hickey's counsel also moved for judgment at the conclusion of Shirley's and Herbert's cases. In that earlier motion he did not contend, at least in the oral portion of the motion, that he was entitled to judgment on the basis that Shirley was guilty of negligence as a matter of law; his grounds were that the evidence was insufficient to prove that Hickey was guilty of primary negligence. At the end of plaintiffs' cases, Mr. Hickey's attorney did, however, refer Judge Ruben to a memorandum of law that he had apparently submitted to him. That memorandum does not appear in either the record extract or the record, and we therefore do not know its contents. Hickey's oral argument in support of his motion for judgment—made at the end of the Kendalls' cases—was as follows:

On behalf of defendant, Carl Jeffrey Hickey, we would move for judgment at this point.

THE COURT: I read your memorandum.

[HICKEY'S COUNSEL]: I appreciate that, Your Honor. I won't reiterate what is in there.

THE COURT: You may do that, but I have read your memorandum.

[HICKEY'S COUNSEL]: I am simply suggesting to the Court that at this point we have speed, at this point, taking everything in a light most favorable to plaintiff, we have speed, we have alcohol, we have marijuana, in light of everything favorable to the plaintiff. What we don't have is evidence that this accident was caused by Mr. Hickey. In other words, that he, any of those three things is the proximate cause of his accident.

I would cite to the Court the case of *Quinn Freight Lines v. Woods* [, 266 Md. 381, 292 A.2d 669 (1972) ]. This is a case where we have a vehicle on a boulevard, straight through a highway, drinking, with .19. And the intruding vehicle, the defendant, sued by the driver on the boulevard, who was .19, that driver—the argument was that he contributed to negligence by drinking.

But the case goes on to hold that intoxication in and of itself is not sufficient to establish proximate cause. And the finding of the court there is that, as a matter of law, there is no —— on the straight-through driver. The citation for that case is 266 Md. 381, 292 A.2d 669 (1972). I would adopt what we have written in regard to that.

Hickey's use of marijuana and alcohol on the night of the accident?

■ As previously noted, there were numerous entries in Hickey's hospital records indicating that he had consumed alcohol and smoked marijuana prior to his hospital admission. At trial, Hickey's counsel conceded that the hospital records as a whole fell within the business records exception to the hearsay rule. Hickey maintained, however, that entries relating to his use of drugs and alcohol were not "pathologically germane" and should therefore be redacted.

The business record exception to the hearsay rule provides, in pertinent part:

(b) **Admissibility.**—A writing or record made in the regular course of business as a memorandum or record of an act, transaction, occurrence, or event is admissible to prove the act, transaction, occurrence or event.

(c) **Time of making records.**—The practice of the business must be to make such written records of its acts at the time they are done or within a reasonable time afterwards.

(d) **Lack of knowledge of maker.**—The lack of personal knowledge of the maker of the written notice may be shown to affect the weight of the evidence but not its admissibility.[17]

Md.Code (1974, 1995 Repl.Vol.), § 10–101 of the Cts. & Jud. Proc. Article.

In *State v. Garlick*, 313 Md. 209, 221–22, 545 A.2d 27 (1988), the Court analyzed the business record exception and said:

"The words, 'regular course of business' ... are not colloquial words but are words of art." So " 'regular course' of business must find its meaning in the inherent nature of the business in question and in the methods systematically

---

**17.** The liability phase of the subject case took place in August 1993 when the Maryland Rules of Evidence were not yet in effect. Maryland Rule 5–803(b)(6) now deals with the business record exception to the hearsay rule and is consonant with section 10–101 of the Courts and Judicial Proceedings Article.

employed for the conduct of the business as a business." In a hospital the "regular course of business" is to treat people, that is, to care for patients. To conduct that business of caring for patients, the making of a hospital record is a method systematically employed, without which proper care of patients would be impossible."

The trustworthiness and reliability of any business record arises from the fact that entries recording an act or event are made in the "regular course of business" and it is the "regular course of business" to record those entries at the time of that act or event or soon thereafter. "Ordinarily, hospital records satisfy these criteria and the information they contain is admissible as long as it is pathologically germane." So events that are "pathologically germane" to that treatment are within the regular course of the hospital's business and the recordations of those events are admissible under a business record exception.

"Pathologically germane" as that term has been defined includes facts helpful to an understanding of the medical or surgical aspects of the case, within the scope of medical inquiry. "A 'pathologically germane' statement 'must fall within the broad range of facts under which hospital practices are considered relevant to the diagnosis or treatment of the patient's condition.' "

(Internal citations omitted.)

In *Sarrio v. Reliable Contract. Co.,* 14 Md.App. 99, 102, 286 A.2d 183 (1972), we dealt specifically with the issue of whether the state of a patient's sobriety was pathologically germane and said:

While the precise issue raised by appellant does not appear to have been passed upon by the appellate courts of this State, we think it is clear, as a factual matter, that whether appellant was drunk or under the influence of alcoholic beverages at the time of his admission to the hospital was entirely relevant to the treatment of his condition as a patient in the hospital. He had been involved in a serious accident from which he sustained injuries diagnosed as a

fractured right leg, a shoulder separation and a cerebral concussion. Patently, the course of treatment to be accorded him could be influenced or acutely affected by his condition of intoxication. The notation could only have been intended to alert the treating physicians to a discernible condition of the patient which may not subsequently have been apparent but still could have had harmful residual effects ultimately. Not to have recorded such an observation would conceivably have constituted a dereliction of duty on the part of the intern. Certainly, the failure to have made the recordation would have rendered a disservice to the appellant as a patient in the hospital.

In the case at hand, there was direct evidence that knowledge of Hickey's alcohol and drug consumption on the night of the subject accident had at least some relevance to his treatment because on his second day in the hospital his treating physician gave orders that Hickey be seen by a "drug and alcohol counselor." Pursuant to those orders, Hickey did see a drug/alcohol counselor on the day of his discharge, and he was referred for out-patient treatment.

Additionally, it is a matter of common knowledge that certain drugs are contraindicated if a patient has recently used alcohol, because the consumption of alcohol is accompanied by well-known psychological and physical side effects. The use of alcohol can adversely affect one's balance, speech, and vision and can give a person an increased tolerance for pain and a concomitant false sense of well-being. Marijuana consumption causes many of these same side effects. Therefore, in order to evaluate accurately a person's condition and to decide what drugs, if any, to prescribe, it is important for a health-care provider to know how much alcohol and/or marijuana the patient has consumed, and when the patient consumed it. The importance of such information is illustrated by the facts in this case.

Hickey was involved in a serious, high speed automobile accident. Drugs were administered to Hickey throughout his hospital stay. He complained to hospital personnel of pain in

several parts of his body and needed x-rays to rule out broken and/or fractured bones. Hospital personnel needed a complete and accurate history of his condition, even though Hickey was "uncooperative and sarcastic." Knowledge that Hickey was under the influence of drugs and alcohol served the purpose of alerting hospital personnel to the possibility that when he regained sobriety his conduct and physical condition might improve. Using the test set forth in *Garlick, supra,* and *Sarrio, supra,* the entry in the hospital chart noting that Hickey had smoked marijuana on the night of the accident, as well as the numerous additional entries indicating that he was under the influence of alcohol upon admission, were pathologically germane because these entries were relevant to the diagnosis and treatment of Hickey's condition.

■ As to the blood serum alcohol test that showed the alcohol content of Hickey's blood at 9:15 p.m. on April 26, Hickey argues:

Without evidence as to when Mr. Hickey's blood test was performed and when it was given to his treating physicians it is impossible to establish, other than through speculation, that the test was somehow pathologically germane to his treatment. Therefore, evidence of the blood test results [should have been] excluded.

In support of this argument, appellant cites only *Moon v. State,* 300 Md. 354, 478 A.2d 695 (1984). *Moon* is a criminal case in which the Court of Appeals granted *certiorari* to determine one issue: "Were the results of Petitioner's blood alcohol and osmolality tests admitted into evidence in violation of his constitutional rights of confrontation?" *Id.* at 357, 478 A.2d 695. The Court held that, when the person who tested the blood and made the report was available and when the report of the blood test was facially unreliable, it was error "not to require the declarant to testify before the [blood test report] is admitted." *Id.* at 370, 478 A.2d 695. The Court

reasoned that the defendant's right to confrontation [18] was denied by receipt of the alcohol test results based on the hearsay exception set forth in section 10–101 of the Courts and Judicial Proceedings Article. On its face, the case *sub judice* is markedly distinguishable from *Moon*. Here, the proceedings were civil and not criminal, and therefore, Hickey did not have a constitutionally guaranteed right to confront witnesses. *See In Re Colin R.*, 63 Md.App. 684, 693, 493 A.2d 1083 (1985). Nevertheless, the Court did make the following observation in *Moon:*

> A most important question was whether the blood test was performed on the 21st as part of Moon's treatment. Moon had been in the hospital three days, been operated on and placed in casts for his injuries prior to February 21st. It would be logical for counsel to inquire how blood drawn on the 18th and tested on the 21st had any diagnostic value for treatment already received. If counsel elicited from the technician that the test was conducted on the 21st in response to a police request, the trial judge may have concluded that the test was not performed in connection with Moon's treatment and, therefore, was not pathologically germane to the reason Moon was in the hospital. *See Yellow Cab Co. v. Hicks*, 224 Md. 563, 168 A.2d 501 (1961); *Shirks Motor Express v. Oxenham*, 204 Md. 626, 106 A.2d 46 (1954); *Lee v. Housing Authority of Baltimore*, 203 Md. 453, 101 A.2d 832 (1954); *Globe Indemnity Co. v. Reinhart*, 152 Md. 439, 137 A. 43 (1927). Counsel may even have inquired as to how the test, even if performed on the 18th, was pathologically germane to Moon's treatment if it were not transmitted to the doctors until the 21st. Under these

---

**18.** The right of a criminal defendant to confront his accusers, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article Twenty-one of the Maryland Declaration of Rights, requires the prosecution to either produce the declarant whose statement it wishes to use against the criminal defendant or to demonstrate the declarant's unavailability. If a witness is unavailable, only hearsay clothed with substantial "indicia of reliability" will be admitted. *Moon v. State*, 300 Md. at 367, 478 A.2d 695.

circumstances, the trial court may have been persuaded that the test was inadmissible.

*Moon,* 300 Md. at 371–72, 478 A.2d 695.

Unlike *Moon,* there is no suggestion that Hickey's blood was tested at the behest of the police, that there was any inordinate delay in receiving the test results, or that the records were "facially unreliable." The alcohol test was ordered thirty-three minutes after Hickey was admitted to the hospital emergency room and was ordered "STAT," meaning that the physician wanted the test results back immediately. Dr. Caplan, who was familiar with hospital procedures at Suburban Hospital, testified, without objection, that the blood tests "probably" were performed shortly after the blood was drawn and that he had no reason to believe that the results were inaccurate. The obvious purpose of the test was to make sure that any drug prescribed would not be contraindicated due to the amount of alcohol in Hickey's blood. *See State v. Moon,* 291 Md. at 466 n. 1, 436 A.2d 420 (1981) (An obvious purpose for the drug test would be for the attending physician to be certain that anything he prescribed would not run counter to that already in his patient's system, just as some pharmacies monitor prescriptions to be certain that the consumer is not using antagonistic drugs. *See Md. Bd. of Pharmacy v. Sav–A–Lot,* 270 Md. 103, 109, 311 A.2d 242 (1973).); *Garlick, supra,* 313 Md. at 223 n. 7, 545 A.2d 27 (same). Under these circumstances, we hold that there was a sufficient showing that the blood test was pathologically germane.

■ Hickey also argues that the reliability of the blood alcohol test was not established. At trial, Hickey's counsel said:

We ... intend to object to the admission of the hospital records. *Of course, they do fall under the business exception to the hearsay rule.*

Specifically, that allows generally hospital records to be admitted. However, with regard to diagnostic blood tests, that in and of itself, is not sufficient. We are concerned about the .15 radius [sic] in that case ... because we do not

feel that that test is pathologically germane to issues for which Mr. Hickey was there.

(Emphasis added.)

Later, responding to the Kendalls' arguments supporting admissibility of the blood-alcohol test, Hickey's counsel asserted:

*What we are fighting is not the records.* ... What we are saying is that .15 is not pathologically germane because of the case law.

(Emphasis added.)

Counsel for Hickey bases this "unreliability" argument on the fact that there is no indication in the records that the report of the blood test was written at the time the test was performed or within a reasonable time afterward. Hickey waived that argument when he conceded below that the hospital records came within the business records exception to the hearsay rule. A record would not fit within that exception if it was not written at the time the test was performed or within a reasonable time afterward. *See* Cts. & Jud. Proc. § 10–101.

## V.

Did the trial judge commit reversible error in admitting into evidence testimony of Dr. Yale Caplan concerning the deleterious effects on driving ability caused by the use of alcohol and/or marijuana?

In regard to Dr. Caplan's testimony concerning how certain levels of alcohol consumption would affect a person's ability to drive, appellant's sole complaint is that Dr. Caplan based his opinion on the assumption that Hickey's blood serum level was .15 at 9:15 p.m. on the date of the accident. Hickey argues that, because it was error to admit into evidence the report of Hickey's blood alcohol test, Dr. Caplan should not have been permitted to base his opinion on that report. As discussed above in part IV, it was not error to admit the report; therefore, this argument fails.

■ Over the objection of Hickey's counsel, Dr. Caplan testified as to how the use of marijuana by itself, or in combination with the use of alcohol, would adversely affect one's ability to drive an automobile. On cross-examination, Dr. Caplan admitted that 1) he did not have any information as to when Hickey smoked marijuana on the day of the accident and 2) he had no information as to whether Hickey had *ever* consumed marijuana prior to the subject accident. Citing *Mitchell v. Montgomery County*, 88 Md.App. 542, 596 A.2d 93 (1991), Hickey argues that, because of this lack of information, Dr. Caplan's testimony regarding marijuana's effects upon driving ability should have been excluded.

In *Mitchell*, the plaintiff's hospital records included urine test results that were positive for PCP and cocaine. By coincidence, Dr. Yale Caplan was also the witness whose testimony was reviewed in *Mitchell*. Dr. Caplan testified in that case regarding the effects of PCP and cocaine on driving ability. As in the present case, he did not know whether the plaintiff was impaired by drugs at the time of the accident. *Mitchell, supra*, 88 Md.App. at 557, 596 A.2d 93. Moreover, Dr. Caplan conceded that it was possible that the plaintiff had last used cocaine up to three days before the accident and that he had last used PCP up to one week before the accident. *Id.* at 557, 596 A.2d 93. The Court reversed a defense verdict and held that, on remand, Dr. Caplan's testimony as to the effects of PCP and drug use should be excluded unless the defendant could produce additional evidence that the plaintiff was under the influence of drugs at the time of the accident. *Id.* at 559, 596 A.2d 93.

*Mitchell* is distinguishable from this case because here plaintiffs produced circumstantial evidence from which a jury could reasonably infer that Hickey was under the influence of marijuana at the time of the accident. That evidence was: 1) an entry in the hospital record referred to the subject accident and stated, "He was under the influence of alcohol and had been smoking marijuana"; 2) Hickey had marijuana on his person, and his vehicle emitted the "strong smell" of marijuana immediately after the accident; 3) a "water bong," which

was still warm, was found in Hickey's truck shortly after the accident; 4) a police officer testified that he was "certain" that the bong was used for smoking marijuana; and 5) Hickey, on April 27, 1991, admitted to a nurse that he had "last" taken marijuana "last night 4/26." Under these circumstances, the trial judge did not err in allowing Dr. Caplan to testify as to the manner in which marijuana affects a user's ability to operate a motor vehicle.

## VI.

Did the trial judge commit reversible error in allowing testimony that a bong was found in Hickey's truck?

█ Again citing *Mitchell, supra,* Hickey argues that evidence relating to the bong found in his vehicle was not relevant to the issue of liability and therefore should not have been admitted.

Evidence, to be admissible, must be both relevant and material.... Evidence is relevant ... if it has any tendency to make the existence of a material fact more or less probable than it would be without the evidence, and a fact is material if it is of legal consequence to the determination of the issues in the case ....  * * * *

The general rule in this State is that all evidence that is relevant is admissible except as otherwise provided .... Relevant evidence may be excluded if the trial court, in its discretion, believes that its probative value is substantially outweighed by the dangers of unfair prejudice.

*Kelly Catering, Inc. v. Holman,* 96 Md.App. 256, 271, 624 A.2d 1300 (1993) (quoting *Myers v. Celotex Corp.,* 88 Md.App. 442, 454, 594 A.2d 1248 (1991)), *aff'd,* 334 Md. 480, 639 A.2d 701 (1994).

In *Mitchell,* the trial court admitted into evidence a "bong" or "water pipe" recovered from the defendant immediately after the accident. In that case, we held that on remand "the bong should be excluded from evidence unless some further evidence is adduced which makes it relevant." 88 Md.App. at 559–60, 596 A.2d 93. In the case at hand, testimony concern-

ing the bong was plainly relevant. The fact that the bong had been recently used provided an important evidentiary link in the chain of evidence the Kendalls used to prove, albeit circumstantially, that Hickey had been using marijuana at, or shortly before, the time of the subject accident.

## VII.

Did the trial judge commit reversible error by allowing Hickey to be cross-examined about his consumption, on the day of the accident, of marijuana and alcohol?

■ After having been called as an adverse witness by Herbert, Hickey testified again when his attorney called him as a defense witness. Counsel for both Shirley and Herbert, over objection, were allowed to cross-examine Hickey on the subject of alcohol and marijuana use. Hickey contends that this constituted prejudicial error and cites *Commission of Medical Discipline v. Stillman*, 291 Md. 390, 422, 435 A.2d 747 (1981), for the well-established principle that "[c]ross-examination can relate only to facts and incidents connected with matters stated in direct examination of the witness. . . ."

In *Matthews v. State*, 68 Md.App. 282, 289, 511 A.2d 548, *cert. denied*, 308 Md. 238, 517 A.2d 1121 (1986), *quoted with approval in Lyba v. State*, 321 Md. 564, 569–70, 583 A.2d 1033 (1991), we found it to be

axiomatic that evidence of a witness's intoxication at the time of the event about which he is testifying is admissible for the purpose of impeaching his credibility.

In *Matthews*, we went on to explain,

It is common knowledge that the quantity of alcohol and/or drugs consumed will affect one's ability to see, to hear, and, generally, to perceive what is occurring. The principle that a party is privileged to cross-examine a witness as to whether he was intoxicated or under the influence of drugs at the time of the incident about which he is testifying was implicitly recognized in *Dove v. State*, 33 Md.App. 601, 606, 365 A.2d 1009 (1976), *rev'd on other grounds*, 280 Md. 730, 371 A.2d 1104 (1977). There, we said:

Generally, cross-examination is restricted to those points on which the witness had testified on direct examination. This rule is not applied to limit cross examination of the witness to specific details brought out on direct examination "but permits full inquiry of the subject matter." Furthermore, it is proper to allow any question which reasonably tends to explain, contradict, or discredit any testimony given by the witness in chief, or which tends to test his accuracy, memory, veracity, character, or credibility. *Seemingly, therefore, a witness may be questioned regarding whether he was sober, intoxicated, or under the influence of drugs at the time of the event in question.*

(Citations omitted).

Other jurisdictions are in accord, recognizing that a witness's capacity for accurate observation and memory are impaired by intoxication and/or drug influence. *See generally Annot.*, 65 A.L.R.3d 705; Annot., 8 A.L.R.3d 479; and *Wharton's Criminal Evidence* § 458.

*Id.* at 289–90, 511 A.2d 548.

Hickey testified on direct examination as to observations he made and actions he took to avoid the accident. Many of these observations and actions were highly relevant to the issue of his primary negligence. In considering the weight to be given to Hickey's testimony, it was helpful for the jury to know how much alcohol and/or marijuana he had consumed and when he consumed it prior to the accident. Therefore, the trial judge did not err in allowing cross-examination regarding Hickey's alcohol or drug consumption.

## VIII.

Was Shirley negligent as a matter of law?

██ Herbert contends in his cross-appeal that, as a matter of law, Shirley was negligent. At the conclusion of the entire case, Herbert's attorney said, "I would move for a directed verdict [sic] against both defendants." He did not state any reason why the motion should be granted as against either

party. Because he did not comply with the particularity requirement of Maryland Rule 2–519(a), Herbert has not preserved this issue for appellate review.

JUDGMENTS AGAINST HICKEY AFFIRMED; JUDGMENT AGAINST NATIONWIDE REVERSED; COSTS TO BE PAID 70% BY CARL J.HICKEY, 15% BY HERBERT KENDALL,AND 15% BY SHIRLEY KENDALL; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION.